Argued and submitted March 6, 2015; reversed and remanded with respect to petitioner's conviction for aggravated murder, otherwise affirmed March 1, 2017

JEFFREY DALE TINER,
*Petitioner-Appellant,*

*v.*

Jeff PREMO,
Superintendent,
Oregon State Penitentiary,
*Defendant-Respondent.*

Marion County Circuit Court
07C13469; A150171

391 P3d 816

Andy Simrin argued the cause for appellant. With him on the briefs were Andy Simrin PC, W. Keith Goody, and Zachary Spier.

David B. Thompson, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Kathleen Cegla, Assistant Attorney General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.*

---

* Shorr, J., *vice* Nakamoto, J. pro tempore.

## ARMSTRONG, P. J.

Petitioner was found guilty by a jury of two counts of aggravated murder, one count of intentional murder, and a number of other crimes. He sought post-conviction relief on a variety of claims. The post-conviction court denied relief on all of petitioner's claims involving the guilt phase of petitioner's criminal trial but granted relief on his penalty-phase claims and voided the imposition of the death penalty. Petitioner appeals the post-conviction court's judgment, raising 29 assignments of error. Defendant, the superintendent of the Oregon State Penitentiary, opposes the majority of petitioner's assignments and raises several cross-assignments of error. The superintendent concedes, however, that the state committed due process violations under *Brady v. Maryland*, 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963), when it failed to disclose material impeachment evidence for two of its witnesses. The superintendent argues that petitioner is entitled to relief for the *Brady* violations only on his conviction for aggravated murder because the undisclosed impeachment evidence was material only to the aggravating circumstances that elevated the murder to aggravated murder.[1]

For the reasons explained below, we reject the majority of the *Brady* claims raised in petitioner's third and fourth assignments of error because petitioner failed to prove that the allegedly withheld information was material to the jury's verdicts. As to the *Brady* violations conceded by the superintendent, we accept the superintendent's concession and agree that petitioner is entitled to relief on his conviction for aggravated murder. We reject the remainder of petitioner's assignments of error and the superintendent's cross-assignments of error without written discussion. We therefore reverse and remand the judgment denying

---

[1] Petitioner was convicted of aggravated murder based on the aggravating circumstances that he committed murder "in an effort to conceal the commission of the crime of assault" and "in an effort to conceal the identity of the perpetrators of the crime of assault." ORS 163.095(2)(e). The Supreme Court held on direct review of petitioner's convictions that the jury's intentional and aggravated murder verdicts had to be merged into a single conviction for aggravated murder. *See State v. Tiner*, 340 Or 551, 566-68, 135 P3d 305 (2006), *cert den*, 549 US 1169 (2007).

post-conviction relief with respect to petitioner's aggravated murder conviction, but otherwise affirm.

## I.   THE FACTS AND PROCEDURAL HISTORY

We state the facts consistently with the post-conviction court's express and implicit findings. *See Montez v. Czerniak*, 355 Or 1, 8, 322 P3d 487, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014).

### A.   *The Underlying Crime*

Petitioner was released from prison in California on parole in December 1992 and became involved in a sexual relationship with Karlyn Eklof. In early 1993, Eklof and her children moved to Lane County, Oregon. Eklof's friend, Salmu, was renting a house there and had invited Eklof and her family to stay with him. While Eklof was living with Salmu, she invited petitioner to visit her. With permission from his parole officer, petitioner visited Eklof at Salmu's house for several weeks in March 1993.

On March 21, Eklof hosted a pizza party at the Salmu residence. About a dozen people attended the party, including John Distabile, Keith and Linda Smith, and Alvin Hope. The party guests began to leave when it started to get dark. After the Smiths arrived home, Linda received a phone call from Salmu asking her if he could spend the night at their place. She told Salmu that she did not have enough room for him to stay over. Eklof called Linda about 15 to 20 minutes later and seemed to be annoyed because the Smiths would not allow Salmu to stay at their home overnight.

At around 7:00 to 7:30 p.m., after most of the party guests had left, Distabile saw a knife "flying" out of the kitchen and into the living room, but he could not see who had thrown the knife. About a half hour later, he saw petitioner palming a small-caliber handgun. Eklof asked Distabile to take Eklof's 13-year-old son home with him so that she could be alone with petitioner. As Distabile was getting ready to leave, he heard petitioner and Eklof talking to Salmu about leaving the house for the night so that they could be alone. Petitioner offered Salmu money so that he could go to a movie. The conversation escalated when petitioner asked Salmu who had been "messing around" with

Eklof. Distabile saw petitioner hit Salmu, knocking his glasses off. He also saw petitioner push Salmu to the ground and straddle him.

Eklof's son, T, and his 12-year-old friend, S, were outside on the front porch during the altercation between petitioner and Salmu. S heard petitioner offer Salmu money to go somewhere so that he could be alone with Eklof. He heard fighting noises such as "thuds" and "slaps," and saw Salmu come outside, put his dog in a car, and then return to the house. S heard Eklof yelling and believed that Salmu was being beaten. S saw Salmu attempt to leave the house, but Eklof pulled him back inside. Salmu looked as though he had been in a fight. At some point during the assault, S heard petitioner say, "Come on, man, I got a gun," and warn Salmu that he would shoot him if he did not leave the house.

T could hear arguing inside the· house but was unable to understand what was happening. At some point, he entered the house and saw petitioner punching Salmu. T returned to the porch and heard continued arguing. After things "calmed down," T went back into the house and saw Salmu sitting on the couch. Salmu's glasses were off, and he had a black eye. T and S left the house with Distabile.

The following day, Distabile returned to Salmu's house to pick up some kitchen supplies and saw that the carpet in the front room was gone. That same day, Eklof and a man went to a floor-covering store to purchase linoleum and carpeting.[2] Hope also returned to Salmu's house the day after the party and saw Eklof and petitioner removing some carpet and furniture. Hope helped them put in the new carpet and offered to take the old materials to the dump. He noticed a large stain on the old carpet. Hope testified that he had previously sold Eklof a .25-caliber handgun and that petitioner was with Eklof during the sale.

Salmu failed to show up for work the day after the party. During his lunch break, Keith Smith went to Salmu's

---

[2] At the criminal trial, an employee of the floor-covering store testified that he could not identify petitioner as the man who had accompanied Eklof, but he said that the man looked "like the man at the end of—this end of the table, but he didn't have a beard at that time." The record does not indicate if petitioner was the man at the "end of the table."

house and asked Eklof if Salmu was home. She said that he was not. Keith returned to Salmu's home the next day and found Salmu's possessions on the porch. Petitioner told Keith that he had bought the personal property from Salmu, who wanted to go to California. Keith returned to the house again that evening, and petitioner offered to help Keith look for Salmu that night, but Keith was unable to do that because he had a prior engagement. Keith returned the next day and told petitioner and Eklof that he had filed a missing-person report with the police regarding Salmu. Petitioner and Eklof became upset on learning that Keith had contacted the police.

Springfield Police Officer Michael McCarthy, the first officer involved in the investigation of Salmu's disappearance, went to Salmu's house a few days after the party. He spoke with Eklof and saw some replacement carpeting in the front entrance of the house. Springfield detectives then contacted Salmu's landlord, Kathy Shults, and asked permission to enter Salmu's house. Shults let them into the house and, while the detectives were in Salmu's bedroom, Eklof entered the house. Shults was aware that Eklof and her children were staying at the house, but she had not met Eklof in person. Evidently unaware that Shults was the landlord, Eklof told the detectives that the landlord had given Salmu and her permission to change the carpet. Eklof also claimed that she had purchased everything inside the house, including appliances that belonged to Shults, for $1,500. Shults acknowledged that the house was in disrepair, that the carpet was soiled, and that the linoleum had been damaged by moisture. She knew that the carpet and linoleum needed to be replaced, but she testified that she had not discussed changing them with Salmu.

Springfield Police Detective Steve Walker searched Salmu's house on March 30 and found what appeared to be blood splatter on the bathroom door and on the molding near the bathroom. Criminalist Terry Bekkedahl examined the house that same day and found blood on a dryer in a utility room and on the paneling and molding next to the bathroom door. He also examined the floor beneath the living room carpet. He saw stains on the padding, but it was later determined that there was no blood on the padding or on the wood subfloor.

In November 1994, Bret Martin was picking mushrooms near the McKenzie River when he found a human skull and a plastic bag containing bones and clothing. Martin reported his findings to a ranger, who contacted the sheriff. Criminalist Bradford Putnam arrived at the location to collect the bones. The remains were partially concealed in a sleeping bag and appeared to be from a single individual. When Putnam picked up the skull, he heard something roll around inside it. Putnam believed that there was a bullet hole in the skull. No gun shell casings or bullets were found at the scene.

Through dental records, the bones were identified as Salmu's. An autopsy revealed two gunshot wounds to Salmu's skull, and a bullet was found inside the skull. The medical examiner was unable to determine whether the gunshot wounds were inflicted before or shortly after death. John Lundy, a forensic anthropologist, also examined Salmu's remains. He found two bullet entrance wounds— one below the left eye and the other through the upper jaw bone. Lundy also examined three finger bones that appeared to have been severed by a "sharp instrument of some kind." DNA testing revealed that one of the blood stains found in Salmu's house matched "the bones [that Martin found] to a very rare number."

In December 1995, petitioner was indicted for four counts of aggravated murder and various other crimes for Salmu's murder. Each of the counts alleged that petitioner had "act[ed] in pursuance of a common intent with Karlyn Eklof, in [causing] the death of [Salmu]." Three months before petitioner's indictment, Eklof was convicted of two counts of aggravated murder and two counts of intentional murder for Salmu's death.[3]

B.   *The Criminal Trial*

We briefly discuss some of the testimony from petitioner's criminal trial that bears on petitioner's post-conviction case. Eklof testified that she had been convicted of Salmu's murder and her conviction had been affirmed on

---

[3] We subsequently affirmed Eklof's convictions without opinion. *See State v. Eklof*, 154 Or App 448, 960 P2d 397 (1998), *rev den*, 328 Or 331 (1999).

appeal, but she was pursuing post-conviction relief from her convictions. When asked if she knew who had killed Salmu, Eklof initially responded, "I take the Fifth on this trial." However, on further questioning, Eklof testified that, when she was in the kitchen in Salmu's house, she heard two gunshots come from the bathroom. She stated that she did not know that petitioner had a gun. She testified that petitioner shot Salmu twice in the bathroom. During cross-examination, Eklof denied participating in the murder and expressed frustration with the police and the prosecution, stating that she had been falsely accused and "railroaded" because the police were trying to "drum up business." On redirect examination, the prosecutor asked Eklof whether it was "fair to say * * * that you've always been consistent that it was [petitioner] who killed [Salmu], not you?" Eklof responded, "It was. It was."

Distabile testified that, the week after the party, he saw petitioner at a friend's house, and petitioner told him that he and Eklof had "kicked the crap out of [Salmu], put him in the dirt." On cross-examination, defense counsel asked Distabile, "And then after the State of Oregon puts some serious pressure on you, essentially indicating they may charge you with various crimes, you changed your story. Isn't that right?" Distabile responded that he had retained an attorney in the case, but only "because they were talking accessory," and he insisted that he was not an accessory to the murder. Defense counsel followed up by asking, "And you got yourself a lawyer and your story changed after they were putting serious pressure on you personally. Is that right?" Distabile responded, "I got more truthful with them, yes."

David, petitioner's brother, also testified for the state. Although David had changed his last name to Johnson by the time of the criminal trial, he was permitted to testify under the name David Tiner due to concerns for his personal safety and the safety of his family; at that time, petitioner was unaware of David's new last name or his home address. David testified that he was living in an apartment in Fresno, California, with his family in the spring of 1993. He offered petitioner a place to stay to "help him get on his feet," and petitioner, Eklof, and Eklof's children

came to David's apartment in late March. They arrived in a car that was full of clothes, bedding, and other household items. After unloading the car, petitioner bought some beer and spray paint, and painted the interior of the car's trunk. Then he and David took a car ride "up into the hills." David became suspicious that "something wasn't right" and asked petitioner what was going on. Petitioner told him that "they had basically had killed a guy and had cut his fingers off" with pruning shears. Petitioner told David that they killed the guy because he was a child molester and explained that they had cut off his fingers to prevent identification.

Petitioner told David that Eklof had stabbed the victim 40 to 50 times and that petitioner had shot him. He said, "'Don't ever use a .25 to kill anybody, it'll—you know, it'll bounce off their chest.'" Petitioner admitted to wrapping the body in a sleeping bag, loading it into a car, driving it to the next county, and rolling it down an embankment. He told David that he and Eklof had moved the victim's car, killed the victim's dog, and had "thrown a bunch of the evidence in the river." He also told David that "they had to pay money to replace the carpeting and linoleum in the house where it had happened."

When police contacted David a few weeks after Salmu's disappearance, he told them that he "didn't know anything about it." David explained, "I was afraid of [petitioner,] and I didn't want to—basically I didn't want to get involved." However, about four months later, in September 1993, David spoke with the police and told them of petitioner's admissions. Petitioner and Eklof joined David for Thanksgiving in 1993. Petitioner commented that "maybe he would get one of his friends to come out and see [David] and go out for a drive in the woods." David interpreted the comment as "a veiled threat."

Petitioner's cousin, Ricky Tiner, testified that petitioner had called him the night of the murder. Petitioner called Ricky again a day or two later and told him that he "would be leaving the area and that there may be somebody looking for him." Petitioner visited Ricky in Arkansas in August 1993. Ricky testified that, when he asked petitioner why somebody would be looking for him, petitioner

explained that "a man had molested some children and that they'd got rid of him."

Linda Little and Willis Morris both testified for the state. Little had met petitioner in Reno, Nevada, late in 1993. Little was a heroin addict, and she bought drugs for and used them with petitioner. Petitioner told Little that he was involved in "some trouble" in Oregon. Morris lived with Little but was incarcerated for a portion of 1993. About a day or two after Morris was released from jail, he was watching television with petitioner and Little at Little's mother's house. A news story came on about a man wanted for a murder in Oregon. Little asked petitioner what kind of trouble he was in, and petitioner told Little and Morris that he had killed someone in Oregon. Petitioner explained that it started with a fight between Eklof and Salmu, and that Eklof had assaulted Salmu. He admitted that "he shot [Salmu], and he wouldn't die, he cut his throat and cut up the body and hid the pieces."

Little testified:

> "They—told me that they had the guy in the bathroom, and that he was—it was kind of a joke. He said he was shooting him and the bullets were bouncing off his head and that he wouldn't die, because the bullets were bouncing off his head. So they had to cut his throat and that's—then they proceeded after that to cut up the body. He tried to shoot him in the head and I guess the bullets were bouncing off."

According to Morris, petitioner told him that he had used an electric knife to cut up the body and that he had put the parts in plastic bags and scattered them around. Morris also recalled petitioner saying that the bullets were "bouncing off of him."

Petitioner told Little and Morris that he and Eklof had killed the man to "keep him from talking." Little testified:

> "He said he was on parole and that [Eklof] had injured [Salmu] by assaulting him and that [Salmu] would go to the police. And [petitioner] couldn't have that because he was on parole, so they were going to have to kill him to keep it quiet."

Little acknowledged at trial that she had been convicted of forgery and prostitution and was in state custody, having been transported to the Lane County Jail from a prison in Iowa. Morris admitted at trial that he had been convicted of robbery in 1983 and felony "drunk driving."

A jury convicted petitioner of two counts of aggravated murder, one count of intentional murder, and various other crimes. The aggravated murder convictions were based on petitioner having killed Salmu "in an effort to conceal the commission of the crime of assault" and "in an effort to conceal the identity of the perpetrators of the crime of assault." Petitioner appealed his judgment of conviction, and the Supreme Court affirmed his convictions and sentences but reversed in part and remanded the case to the trial court to merge the aggravated and intentional murder counts into a single conviction for aggravated murder. *See State v. Tiner*, 340 Or 551, 566-68, 135 P3d 305 (2006), *cert den*, 549 US 1169 (2007).

## C. *The Post-Conviction Proceedings*

Petitioner timely filed a petition for post-conviction relief, alleging 15 claims for relief. The post-conviction court issued a 12-page written decision denying all of petitioner's claims regarding the guilt phase of petitioner's criminal trial. The court ruled that none of petitioner's claims was procedurally barred, but they were meritless.

Among the many claims that petitioner raised with regard to the guilt phase of the trial, he argued that his right to due process, under *Brady*, was violated when the state failed to turn over evidence that was either exculpatory or that had impeachment value against several of its witnesses. He also argued that his right to due process, under *Napue v. Illinois*, 360 US 264, 269-70, 79 S Ct 1173, 3 L Ed 2d 1217 (1959), was violated when the state knowingly permitted the presentation of false testimony and then made misleading arguments to the jury. The post-conviction court rejected all of petitioner's *Brady* and *Napue* claims.

Petitioner appeals, arguing that the post-conviction court erred because the collective materiality of the *Brady*

and *Napue* violations "'undermines confidence in the outcome of the trial.'" (Quoting *Kyles v. Whitley*, 514 US 419, 434, 115 S Ct 1555, 131 L Ed 2d 490 (1995).) The superintendent opposes the majority of petitioner's arguments, but concedes that the state committed *Brady* violations with regard to two of its witnesses. The superintendent contends that petitioner is entitled only to limited relief as a result of those violations. For the reasons discussed below, we agree with the superintendent.

## II. LEGAL ANALYSIS

Post-conviction relief is warranted when there has been a "substantial denial" of "rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void." ORS 138.530(1)(a). "We review the post-conviction court's judgment for legal error, accepting as true the court's supported factual findings." *Boyles v. Myrick*, 282 Or App 517, 520, 385 P3d 1227 (2016). "Additionally, '[i]f findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the [post-conviction court's] ultimate conclusion.'" *Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002) (quoting *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)).

### A. Brady *and* Napue *Legal Standards*

"Under [*Brady*], a prosecutor's withholding of favorable evidence from a criminal defendant 'violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Eklof v. Steward*, 360 Or 717, 719, 385 P3d 1074 (2016) (quoting *Brady*, 373 US at 87). A prosecutor has an affirmative duty to disclose favorable evidence, even if there has been no request for disclosure by the defendant. *United States v. Agurs*, 427 US 97, 107, 96 S Ct 2392, 49 L Ed 2d 342 (1976). That duty to disclose applies to impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 US 667, 676, 105 S Ct 3375, 87 L Ed 2d 481 (1985). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense,

the result of the proceeding would have been different." *Id.* at 682. Thus, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 US 263, 281-82, 119 S Ct 1936, 144 L Ed 2d 286 (1999).

In *Napue*, the Supreme Court held that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." 360 US at 269. "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* "A claim under *Napue* will succeed when (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *Henry v. Ryan*, 720 F3d 1073, 1084 (9th Cir 2013) (internal quotation marks omitted). False testimony is material when there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 US at 103.

Although the standards for determining materiality under *Brady* and *Napue* are different, we analyze those claims collectively to determine whether petitioner was denied due process of law. *See Jackson v. Brown*, 513 F3d 1057 (9th Cir 2008); *see also Kyles*, 514 US at 436 (stating that materiality should be considered "collectively, not item by item").

B. *Petitioner's* Brady *and* Napue *Claims*

Petitioner alleged that the state withheld the following materials that it was required to disclose under *Brady*:

"1. Notes apparently written by an investigator working for Eklof (and provided to prosecutors) that revealed she had implicated James Davis in connection with Salmu's murder and that a roll of new carpet had been observed in Salmu's house shortly before he was killed

"2. Information that the prosecution knew that Eklof thought that, by speaking to law enforcement officers and

implicating Petitioner in Salmu's murder, she thought she was going to receive favorable treatment, including immunity from prosecution and travel arrangements to anyplace she wanted to go

"3.   A letter from Washoe County (Nevada) Deputy District Attorney Roger Whomes to Deputy District Attorney Frederick Hugi indicating that Linda Little and Willis Morris were strongly biased against Petitioner

"4.   A report by an investigator working for the Lane County District Attorney indicating that Eklof had confessed to a cellmate, and that confession was inconsistent in virtually every detail with other statements Eklof had made about the Salmu murder

"5.   Evidence that Eklof had made a false complaint of sexual misconduct against a law enforcement officer investigating Salmu's homicide

"6.   Journals kept by Eklof detailing her recollections about Salmu's murder

"7.   Reports by Detectives Walker and Warthen indicating that they had interviewed John Distabile regarding Salmu's murder, that Distabile initially indicated that he learned about Salmu's disappearance by reading about it in the newspaper, that the detectives threatened Distabile with arrest and prosecution in connection with the case, that the detectives suggested to Distabile that Petitioner and Eklof were responsible for Salmu's murder, and that the detectives required Distabile to be photographed for a 'mugshot profile' in connection with Salmu's murder

"8.   Statements by Distabile in a report by Detective Kennedy that Petitioner told him 'Karlyn kicked the Shit out of James' and 'I buried him.'

"* * * * *

"9.   David Tiner's criminal history

"10. The fact that, before Petitioner's trial, Deputy District Attorney Lane made a promise to Linda Little that he would write a letter on her behalf to her Iowa parole board and judge if she testified against Petitioner[.]"

Petitioner alleged several *Napue* violations related to his *Brady* claims: (1) the prosecutor, knowing that Eklof had once implicated Davis in the murder, asked Eklof the

following leading question: "[I]s it fair to say * * * that you've always been consistent that it was [petitioner] who killed [Salmu], not you?"; (2) the prosecutor allowed petitioner's brother to testify under the name David Tiner, even though David had changed his name to David Johnson by the time of petitioner's trial; (3) the prosecutor allowed Distabile to testify that he did not have "any reason to particularly want to get [Eklof and petitioner] into trouble," despite the existence of undisclosed police reports indicating that Distabile had said that he wanted "just to get rid of the woman" and wanted Eklof "to be out of his life," and the prosecutor argued to the jury that there was no evidence that Distabile had received any favors or that he needed "to lie to save his own skin"; and (4) the prosecutor had promised to write a letter to the parole board on Little's behalf and knew that Morris held a grudge against petitioner, but the prosecutor nonetheless argued to the jury that Little and Morris had no motive to lie and were not receiving any favors in exchange for their testimony.

The post-conviction court rejected all of petitioner's *Napue* claims without written explanation. The court also rejected all of petitioner's *Brady* claims, making express findings as to some of the allegedly withheld information. On appeal, the parties dispute whether the post-conviction court made explicit or implicit findings on whether some of the alleged *Brady* material—namely, everything *other* than the Washoe County prosecutor's letter, prosecutor Lane's promise to write Little a letter, and David Tiner's criminal convictions—had actually been withheld from the defense. However, we need not decide whether the court made such findings because we agree with the post-conviction court's ultimate conclusion that any nondisclosure of the disputed evidence did not cause petitioner to suffer prejudice and, thus, that that evidence was not material under *Brady*.

### 1. *Eklof and Distabile*

We begin with the alleged *Brady* and *Napue* violations involving Eklof and Distabile. The post-conviction court determined that the information pertaining to Eklof was not material impeachment evidence because Eklof had been "convicted of felony assault and she had a violent past

and questionable mental stability. There is only speculation that her testimony could have been discredited any further[,] causing the jury to reach a completely different result." The court came to a similar conclusion regarding Distabile:

> "As to Distabile, he was cross[-]examined at trial and admitted that he had told more than one story to the police. At trial he stated he knew there was conflict between Salmu and the Petitioner and Eklof and that they would physically abuse Salmu at times. If there was a discovery violation regarding Distabile, it was pretty much cured by cross[-]examination."

We agree with the post-conviction court's conclusion that petitioner failed to prove prejudice as a result of any non-disclosure of evidence impeaching Eklof and Distabile. That is, there is no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 US at 682.

As the post-conviction court concluded, both Eklof and Distabile had been significantly impeached during petitioner's trial. Eklof, who at times refused to testify and at times implicated petitioner in the murder, acknowledged that she had been convicted of Salmu's murder and felt that she had been falsely accused of that crime. Her brief testimony signaled a potential bias in testifying against petitioner—that is, if petitioner were solely responsible for Salmu's murder, her conviction might be overturned. Distabile, in turn, acknowledged that, at one point, he had been considered a possible suspect in the murder, signaling that he might have an interest in testifying favorably for the prosecution. Distabile also acknowledged that he had changed his story after his initial interview with the police. Thus, the allegedly withheld impeachment evidence pertaining to Eklof and Distabile was qualitatively similar to other impeachment evidence that was adduced at trial. The allegedly withheld evidence would have been cumulative of other evidence of bias and would not have enabled counsel to further discredit either witness. *See Morris v. Yist*, 447 F3d 735, 741 (9th Cir 2006) (where undisclosed impeachment evidence would not have enabled counsel to further discredit a witness, nondisclosure does not give rise to a *Brady* violation).

Moreover, although Eklof's and Distabile's testimony was relevant to proving that petitioner had participated in the intentional murder of Salmu, it was not *crucial* to proving petitioner guilty of that offense. Indeed, there was ample other evidence of petitioner's guilt, including eyewitness testimony from S and T about the assault on Salmu; testimony from the Smiths and Hope about observations made in the days after the crime, including that the carpet had been replaced and that petitioner and Eklof had taken all of Salmu's belongings out of the house; petitioner's admissions to multiple witnesses of his role in the murder, including to Ricky Tiner, whose testimony was unimpeached; and physical evidence corroborating much of petitioner's admissions about the murder. *See id.* (potential *Brady* evidence not material in light of other compelling evidence of guilt).

Viewing the Eklof/Distabile impeachment evidence in the context of the trial as a whole, we are not persuaded that there is a reasonable probability that the undisclosed information would have affected the jury's assessment of Eklof's and Distabile's credibility, or its assessment of petitioner's guilt. That is, the alleged withholding of the information regarding those witnesses does not undermine our confidence in the outcome of petitioner's trial. *See Bagley,* 473 US at 678; *see also Strickler,* 527 US at 290 (materiality involves questioning whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict" (quoting *Kyles,* 514 US at 435)). Accordingly, petitioner has not demonstrated that the impeachment evidence pertaining to Eklof and Distabile was material under *Brady,* and he has not demonstrated a basis for post-conviction relief based on the state's alleged failure to disclose it.

Petitioner's *Napue* claims involving Eklof and Distabile fail as well. Once again, petitioner's claims fall short in terms of materiality. Petitioner claims that the prosecutor elicited false testimony from Eklof that she had "always been consistent" that it was petitioner who had killed Salmu, despite the existence of a police report indicating that Eklof had once implicated a man named Davis in the murder. He claims that the prosecutor knowingly allowed Distabile to testify that he did not have a reason

to want to get petitioner in trouble, despite the existence of police reports indicating that Distabile wanted "to get rid of" Eklof and wanted Eklof "to be out of his life." Assuming that petitioner's proof at the post-conviction proceeding was sufficient to show that the prosecution knowingly elicited false testimony from Eklof and Distabile, petitioner's proof was insufficient to demonstrate that there was "any reasonable likelihood that the false testimony could have affected the judgment of the jury." In light of the overwhelming evidence of petitioner's involvement in the murder, any evidence that his codefendant had implicated someone else while she was being investigated for her own participation in the murder, or that Distabile had a motivation to testify falsely against petitioner, would not likely have had any effect on the jury's verdict.[4] *See, e.g., Agurs*, 427 US at 103.

### 2. *David Tiner*

With regard to David Tiner's criminal history, petitioner argues that the nondisclosure of David Tiner's two prior criminal convictions was material because they were relevant to explain why David, who had changed his last name to Johnson before petitioner's trial, testified under the last name Tiner. Petitioner argues that David testified under the Tiner name to "escape from his admittedly 'checkered past'" and not, as the trial court had found, for reasons of personal and family safety. The superintendent acknowledges that David's criminal history was not disclosed to the defense but argues that David's two criminal convictions did not constitute material *Brady* information because the convictions would have been inadmissible as impeachment evidence under OEC 609. We agree with the superintendent.

"Under *Brady*, no due process violation occurs if the evidence withheld by the prosecution would have been inadmissible." *State v. Deloretto*, 221 Or App 309, 322 n 3, 189 P3d 1243 (2008), *rev den*, 346 Or 66 (2009) (citing *Wood v. Bartholomew*, 516 US 1, 8, 116 S Ct 7, 133 L Ed 2d 1 (1995)). "Whether evidence is admissible is, in the first instance,

---

[4] Moreover, as to the purportedly false statement by Eklof, the prosecutor can be understood to have asked Eklof whether, between Eklof *and* petitioner, Eklof had consistently identified petitioner as the person who had murdered Salmu. Nothing in the record suggests that that is other than a true statement.

a matter of state law." *Id*. Thus, we look to Oregon law to determine whether David's convictions would have been admissible as evidence at petitioner's criminal trial. Under OEC 609(1)(a), evidence of a witness's prior conviction for a crime is admissible to attack the witness's credibility if the crime was "punishable by death or imprisonment in excess of one year under the law under which the witness was convicted" or if the crime involved a false statement or dishonesty. Under OEC 609(3), a prior conviction is not admissible as impeachment evidence if "more than 15 years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date."

Here, both of David's convictions were misdemeanor offenses that were punishable by less than one year of imprisonment, and neither was a crime involving a false statement or dishonesty. Petitioner contends, however, that one of the convictions, a 1980 California conviction for assault with a deadly weapon, should be treated as a felony under OEC 609(1)(a). In California, assault with a deadly weapon, Cal Penal Code section 245(a)(1), is considered a "wobbler" offense that can be charged as either a misdemeanor or a felony. *See In re Grayden N.*, 55 Cal App 4th 598, 600 n 1, 64 Cal Rptr 2d 277 (1997) (explaining that "Penal Code section 245, subdivision (a)(1) is a 'wobbler' punishable either as a felony or a misdemeanor"); *see also People v. Park*, 56 Cal 4th 782, 789, 299 P3d 1263 (2013) ("There is * * * a special class of crimes involving conduct that varies widely in its level of seriousness. Such crimes, commonly referred to as 'wobbler[s],' are chargeable or, in the discretion of the court, punishable as either a felony *or* a misdemeanor[.]" (Emphasis in original; internal citations omitted.)). Petitioner acknowledges that David was punished as a misdemeanant for that offense but argues that the conviction should nevertheless be considered a felony for purposes of OEC 609(1)(a) because the offense was, in theory, subject to punishment as a felony. We are not persuaded that David's 1980 misdemeanor conviction was admissible under OEC 609(1) merely because the offense could have been prosecuted as a felony. In any event, as the post-conviction court noted, the 1980 conviction was over 15 years old at the time of petitioner's criminal trial

and was thus inadmissible under OEC 609(3). Accordingly, David's criminal history is not material under *Brady*, and the state's withholding of that information does not entitle petitioner to post-conviction relief.

Petitioner's *Napue* claim regarding David is likewise unavailing. Petitioner claims that the prosecutor knowingly allowed David to testify under the last name Tiner, which was false because David had changed his last name to Johnson before petitioner's criminal trial. However, the prosecution cannot be faulted for permitting false testimony when the issue of David's name was litigated at the criminal trial, and the court ruled that David would be permitted to testify under the name Tiner to protect his new identity from his brother. Thus, petitioner failed to demonstrate that the prosecutor committed a *Napue* violation by simply adhering to the court's order.

### 3. *Little and Morris*

We turn to petitioner's *Brady* and *Napue* claims involving Little and Morris. The impeachment evidence about them that was withheld from the defense included a letter from a Nevada prosecutor to the state indicating that Little and Morris were strongly biased against petitioner, and that the state had promised to write a letter to Little's parole board in exchange for her testimony against petitioner. Petitioner claims that the withholding of that material constituted *Brady* violations. He claims further that, despite the prosecutor's awareness of that impeachment evidence, the prosecutor improperly argued to the jury that Little and Morris had no motive to lie and were not receiving any favors in exchange for their testimony, thus violating *Napue*.

The post-conviction court rejected petitioner's *Brady* and *Napue* claims, and petitioner assigns error to those rulings. We affirm the court's denial of petitioner's *Napue* claims regarding Little and Morris. Petitioner complains that the prosecutor committed *Napue* violations by making improper closing argument about Little and Morris, despite the fact that information existed that suggested that the witnesses were biased against petitioner. However, the statements an attorney makes during closing argument are not evidence.

*See, e.g., State v. Dugan,* 177 Or App 545, 550, 34 P3d 726 (2001). In fact, at the start of petitioner's trial, the jury was specifically instructed that "[t]he opening statements and closing arguments of the attorneys are intended to be helpful to you to understand the evidence, although their statements are not part of the evidence." Thus, petitioner's claim does not establish that the prosecutor knowingly elicited or permitted false *testimony* or *evidence,* as required under *Napue.* Petitioner is not therefore entitled to relief based on his claim that the prosecutor improperly argued that Little and Morris had no motive to lie and had not received any favors for their testimony.

As to petitioner's *Brady* claims related to Little and Morris, the post-conviction court denied relief on those claims on the ground that the undisclosed evidence would not have been useful as further impeachment evidence because those witnesses had already been significantly impeached through cross-examination. Petitioner assigns error to that ruling, and the superintendent concedes that the court erred in part, contending that the impeachment evidence related to Little and Morris was material as it pertained to the aggravating circumstances giving rise to petitioner's aggravated murder convictions and, thus, that the state had violated petitioner's due process rights under *Brady.* However, the superintendent contends that the impeachment evidence was not material to the jury's intentional-murder verdict, and argues that petitioner is entitled to relief only on the aggravated-murder verdicts. Again, we agree with the superintendent.

Little and Morris both testified about admissions that petitioner had made to them months after the murder. Those admissions included details about the murder itself, which were largely corroborated and cumulative of other evidence of petitioner's involvement in Salmu's death. However, Little and Morris also testified about admissions that petitioner had made about his *motivation* for killing Salmu. They testified that petitioner had admitted to them that he had murdered Salmu because petitioner was on parole and was afraid that Salmu was going to report to the police the assault perpetrated against him by petitioner and Eklof, which led petitioner to conclude that it was necessary

to kill Salmu to "keep it quiet" and forestall revocation of petitioner's parole. That testimony was uncorroborated by other evidence in the record. Indeed, several other witnesses testified that petitioner had said that he had killed Salmu because Salmu was a child molester. Thus, Little's and Morris's testimony about the reasons that petitioner had killed Salmu was qualitatively different from any of the other evidence admitted at trial.

The superintendent concedes that Little's and Morris's testimony about petitioner's motivation for killing Salmu was crucial to the prosecution's aggravated-murder charges, which alleged that petitioner had committed the murder "in an effort to conceal the commission of the crime of assault" and "in an effort to conceal the identity of the perpetrators of the crime of assault." Hence, the undisclosed impeachment evidence—namely, information of witness bias—was material *Brady* evidence as to the aggravating circumstances that elevated the murder to aggravated murder, and the withholding of that evidence was a violation of due process. But, the superintendent argues, because Little's and Morris's testimony about petitioner's admissions regarding the details of the murder itself was qualitatively similar to and cumulative of other evidence in the record, the withheld impeachment evidence was not material to the jury's verdict on the underlying murder. As a result, the superintendent argues that petitioner is entitled only to a limited remedy: "[R]etrial on the aggravating circumstances that made petitioner's murder of [Salmu] an *aggravated* murder," with no relief on the underlying verdict for intentional murder. (Emphasis in original.)

In his reply brief, petitioner characterizes the superintendent's argument to be that, although the state committed *Brady* violations, those violations should have no effect on the verdict for intentional murder because they are harmless. He argues that the superintendent is foreclosed from making that argument because, once a *Brady* violation is established, the violation cannot be found to be harmless. *See Kyles*, 514 US at 435 ("[O]nce a reviewing court applying *Bagley* has found *constitutional error*, there is no need for further harmless-error review[.]" (Emphasis added.)). However, as the Supreme Court explained in *Kyles*, there

is no need for further harmless-error analysis once a *Brady* violation is established because the materiality test under *Brady* "necessarily entails" the harmless-error test set out in *Brecht v. Abrahamson*, 507 US 619, 113 S Ct 1710, 123 L Ed 2d 353 (1993). *Kyles*, 514 US at 435. That is, the test for materiality under *Brady* is more rigorous than the test for harmless error under *Brecht*, which asks whether a constitutionally significant trial error had a "substantial and injurious effect or influence in determining the jury's verdict."[5] *Brecht*, 507 US at 623. Thus, the "materiality standard in traditional *Brady* claims supplants harmless-error review." *Rosencrantz v. Lafler*, 568 F3d 577, 584 n 1 (6th Cir 2009). We therefore analyze the superintendent's argument in light of *Brady*'s materiality test, not in terms of the *Brecht* harmless-error test.

We conclude that Little and Morris provided critical testimony regarding the circumstances that elevated petitioner's murder of Salmu to aggravated murder. Indeed, they were the only witnesses to testify that petitioner killed Salmu to conceal petitioner's assault of Salmu, thereby avoiding disclosure of petitioner's parole violation for assaulting Salmu. Had the jury heard evidence that Little and Morris were strongly biased against petitioner, and that the prosecutor had offered Little a favor in exchange for her testimony, there is a reasonable probability that the jury would have acquitted petitioner of aggravated murder. Thus, the state's withholding of that impeachment evidence was material to the jury's aggravated-murder verdicts.

We do not reach the same conclusion with respect to the verdict for intentional murder. Little's and Morris's testimony added minimal value to the state's case for intentional murder. Their testimony was qualitatively similar to and cumulative of other—more reliable—evidence of petitioner's involvement in the murder. Viewing the Little/ Morris impeachment evidence in the context of the trial as a whole, we are not persuaded that the impeachment evidence

---

[5] The *Brecht* harmless-error standard applies to federal habeas corpus proceedings dealing with constitutional violations and is less rigorous than the harmless-error standard applied on direct review under *Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967), which requires the state to prove that an error was harmless beyond a reasonable doubt.

could have put the intentional murder case "'in such a different light as to undermine confidence in the verdict.'" *Strickler*, 527 US at 29 (quoting *Kyles*, 514 US at 435).

## III. CONCLUSION

The post-conviction court erred in denying petitioner relief on his *Brady* claims involving Little and Morris. However, because the withheld impeachment evidence regarding them was material only to the aggravated-murder verdicts, petitioner is entitled to relief only on those verdicts.

Reversed and remanded with respect to petitioner's conviction for aggravated murder; otherwise affirmed.