ARMSTRONG, P. J.
*730 Defendant appeals a judgment convicting him of first-degree sexual abuse, ORS 163.427. In his first three assignments of error, he challenges pretrial rulings in which the trial court quashed subpoenas for school and Department of Human Services (DHS) records pertaining to the complainant (V) and his cousin (IA) without conducting an in camera review of the records.[1] He claims that he was entitled under Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963), to the production of the records or an in camera review of them because they contained evidence that was favorable and material to his defense. We conclude that defendant failed to meet his burden of making a threshold showing of materiality and favorability with regard to V's school records and IA's DHS records. However, defendant did make a sufficient threshold showing with regard to IA's school records, and thus the trial court erred in denying defendant's request for an in camera review without first engaging in an exercise of discretion to determine whether such a review would be appropriate. We therefore vacate and remand for the trial court to determine whether to review IA's school records in camera .
When V was six years old, he lived with his mother (Jones), his aunt, and his older cousin, IA. V and his family attended the First Baptist Church, and V participated in a church-sponsored after-school program called the Good News Club. Although defendant *295 was a member of a different church, he occasionally attended events at the First Baptist Church and volunteered with the Good News Club. Jones first met defendant at a First Baptist Church Halloween party in October 2010, when he introduced himself and told her that he knew V from the Good News Club.
Shortly after they met, Jones began working for defendant as a house cleaner. V would sometimes join his *731 mother while she cleaned defendant's house. On those occasions, V and defendant would spend time together. One day, V asked to spend the night at defendant's house, to which defendant and Jones agreed.
In May 2011, V spent a night with defendant at defendant's house. He and defendant played with puzzles and watched a movie. While the movie was playing, defendant told V to come over and sit beside him in an armchair. When V complied, defendant reached into V's pants and touched his penis. After the movie, V went to sleep in the downstairs guest room, while defendant spent the night upstairs in his bedroom. The next morning, defendant dropped V off with Jones at defendant's church. Jones asked V if he had had a good time at defendant's house, and V said yes.
At some point in the spring of 2011, Jones told defendant that she would no longer have any contact with him. Jones testified that she had gotten into a conflict with members of the First Baptist Church and had posted a message related to that conflict on her Facebook page. When defendant asked her to remove the message, she complied but sought to explain to defendant her reasons for posting the message. However, defendant would not listen to her explanation, and she became angry because she felt that defendant was not supporting her. She told defendant that she would not be able to clean for him anymore. Jones also cut off contact with several members of the First Baptist Church and, sometime in the spring of 2011, she and her family were banned from the church.
In the fall of 2011, Jones and V were home watching television when V placed his hand on Jones's upper right thigh. She told V that that was inappropriate and then asked if anyone had touched him like that before. V told her that defendant had put his hand down V's pants and touched him on the night of the sleepover. Jones did not report the incident to law enforcement; although she considered what happened to be inappropriate, she did not think it was a crime.
In October 2011, Jones sent a note to a member of the First Baptist Church stating that V had "lost his innocence *732 due to an 'inappropriate relationship' with a revered gentleman." In January 2012, Jones emailed a different member of the church and again made a reference to V being sexually abused. The recipient of the email contacted the church's pastor, who then reported the incident to law enforcement in early February 2012. The police spoke with Jones and, after she reported V's disclosure about defendant, they initiated a criminal investigation.
On February 29, 2012, V was interviewed by Wimalasena, a forensic interviewer with the Lincoln County Children's Advocacy Center (CAC); the interview was recorded and, ultimately, played for the jury. During the interview, V described his home life and stated that, sometimes, he would get into physical altercations with his cousin, IA. He recounted one incident when IA got mad because V had told on him, and IA dragged V across the floor. V told Wimalasena that IA had also punched and kicked him. V then described the night that he had spent at defendant's home. He stated that, while he and defendant were watching a movie, defendant put his hand in V's underwear and touched and squeezed his "private part." V stated that he told defendant that he was scared, and that defendant then went upstairs to go to sleep.
Jones also provided information to CAC and stated that V was performing at an above-average level in school, was not having difficulties with other children, and was not on an Individualized Education Program (IEP). She also reported that there were " 'no incidents of exposure to fighting or violence' " and that V had no " 'sexual exposure' "-meaning that V had not seen nudity or sexual activity on television, movies, videotapes, *296 computers, or magazines and that there was no pornography in the home.
Defendant was indicted on two counts of first-degree sexual abuse.[2] Before trial, defendant issued several subpoenas duces tecum to obtain V's and IA's school records, as well as IA's DHS records. V, IA, and DHS each moved to quash the subpoenas on the ground that the records were confidential. In response to the motions to quash, defendant argued *733 that all of the records that he sought contained favorable and material evidence, and that he was entitled to disclosure of the records under Brady and its progeny.
Defendant contended that V's and IA's school records contained evidence relevant to support his theory of defense and to impeach Jones. He explained that information that he had received in pretrial discovery contradicted Jones's statements made at the CAC interview that V was performing well in school and that he had not been exposed to violence or sexual activity at home. Specifically, defendant had received reports and emails during discovery that indicated that (1) IA had been sexually abused when he was three years old; (2) IA had physically abused V; (3) IA had brought pornography to school that he had obtained from home; (4) IA had stabbed another student with a pencil; (5) IA had damaged his aunt's car; (6) IA had made false allegations against his mother and Jones about having been stabbed with a fork; (7) V had made an allegation of abuse against the pastor of the First Baptist Church, which had not been prosecuted; and (8) V was seeing a school counselor and was being coached on how to be a witness at trial.
Thus, defendant argued, he was entitled to the production of specific portions of V's and IA's school records that pertained to those incidents and that showed "any specific changes in behavior including the disclosure of any IEP for either child." He argued that the information could be used to impeach Jones's credibility and was relevant to his theory of defense, which was that the allegations of abuse against defendant were false and "designed to hurt the church for interfering in the family's problems with [IA] and for ultimately rejecting the Jones family."
With respect to IA's DHS records, defendant claimed that they contained information that IA had been physically and sexually abused, that IA had physically abused V, and that IA had brought pornography to school. Defendant argued that the records were relevant to challenge the adequacy of Wimalasena's interview with V because they demonstrated a failure by CAC to conduct an adequate review of V's home life when it was evaluating V's disclosure of sexual abuse.
*734 In the alternative, defendant requested that the trial court conduct an in camera review of the school and DHS records to determine if they contained any exculpatory or material impeachment evidence.
The trial court granted the motions to quash and denied defendant's request for an in camera review of the records. With regard to the school records, the court concluded that defendant had failed to establish that the information sought was relevant or that it was information that was not already available to him through other sources. With regard to V's school records, the court explained:
"If this child had made a disclosure to somebody who worked at the school and had said, you know, this is everything that happened and this is the person who did it to me, * * * those in fact, would be discoverable for you to have the statements that were made, or if the school conducted an independent investigation.
"But just to say carte blanche that you want to see supposedly if the school noticed a change, what if there wasn't any change? What if they did? I mean, that's not gonna, that doesn't prove any evidence, prove a fact that's gonna be an issue or not at home. I mean, it doesn't mean what a youth does at home versus what they do at school.
"So as I said, these records are confidential. I don't even know if the youth is on an IEP. That contains highly confidential information. And I just don't see how any of it would be relevant to this proceeding or *297 exculpatory to this proceeding or that you get to see the proceeding."
Likewise, the court concluded that any information contained in IA's school records, including information that IA had been violent towards V, had no bearing on the ultimate issue of guilt or on the credibility of the state's witnesses at trial. Furthermore, the court found that much of the information defendant sought to obtain through the school records was already available to him through reports that he had received in pretrial discovery, such as information that Jones had directed the school to prohibit any contact between V and members of the First Baptist Church and any reports that prompted referrals to law enforcement or DHS.
*735 The court also ruled that defendant had failed to establish that IA's DHS records were relevant to impeach Wimalasena and to challenge the adequacy of her interview with V, because the court was aware of "no provision that says that the interviewer is supposed to go out on her own and seek independent corroboration" from other members of the victim's household. Thus, the court concluded that defendant was not entitled to IA's DHS records for the purpose of cross-examining Wimalasena about the adequacy of her interview with V.
Following a jury trial, defendant was convicted of first-degree sexual abuse and sentenced to 75 months' imprisonment. On appeal, defendant challenges the trial court's rulings quashing his pretrial subpoenas and denying his requests for an in camera review of the school and DHS records. He claims that the court's rulings violated his right to due process under Brady and its progeny.[3]
Because it is dispositive, we focus on the trial court's denial of defendant's request for an in camera review of the school and DHS records to determine if they contain Brady material. Under Brady , "[e]vidence is 'favorable to the accused' if it is either directly exculpatory or could be used to impeach a government witness." State v. Bray , 281 Or. App. 584, 599, 383 P.3d 883 (2016), rev. allowed , 361 Or. 543, 397 P.3d 30 (2017) (quoting United States v. Bagley , 473 U.S. 667, 676-77, 105 S.Ct. 3375, 87 L.Ed. 2d 481 (1985) ). "Oregon cases interpreting Brady have required defendant to make some showing, beyond mere speculation, that the evidence he seeks will be favorable to him and material to his guilt or innocence." State v. Spada , 33 Or. App. 257, 259, 576 P.2d 33 (1978). Materiality "includes not only relevance; it also encompasses a requirement that the state's failure to disclose the evidence be *736 prejudicial." Bray , 281 Or. App. at 599, 383 P.3d 883. The United States Supreme Court has explained:
"Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require a demonstration by a preponderance that disclosure of the * * * evidence would have resulted ultimately in the defendant's acquittal[.] * * * [The] touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the [failure to provide the evidence] 'undermines confidence in the outcome of the trial.' "
Kyles v. Whitley , 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed. 2d 490 (1995) (quoting Bagley , 473 U.S. at 678, 105 S.Ct. 3375 ).
In determining whether to conduct an in camera review of confidential records to search for possible Brady material, a trial court must engage in a two-step process.
*298 "The first step requires the party seeking such a review to make a threshold showing that it is reasonable to believe that the records for which review is sought contain evidence of sufficient import to the defendant's guilt to require disclosure of the evidence to the defendant." State v. Covington , 291 Or. App. 514, 517, 422 P.3d 276 (2018) (citing State v. Lammi , 278 Or. App. 690, 375 P.3d 547 ( Lammi I ), adh'd to as clarified on recons , 281 Or. App. 96, 380 P.3d 1257 ( Lammi II ), rev. den. , 360 Or. 697, 388 P.3d 710 (2016) ; see also Bray , 281 Or. App. at 617-18, 383 P.3d 883. We review that determination for legal error. Lammi I , 278 Or. App. at 694, 375 P.3d 547 ). After that initial showing is made, the trial court then has discretion whether to undertake an in camera review of the material, and we review that determination for abuse of discretion. Covington , 291 Or. App. at 520-21, 422 P.3d 276.
Defendant advances five arguments to support his claim that he was entitled to an in camera review of V's and IA's school records and IA's DHS records: (1) the records could have supported his theory of defense-that the allegations "arose out of the acrimonious dispute with the church *737 and [the] family's anger regarding defendant's perceived interference"; (2) they could have established the motive or bias of V and Jones; (3) they could have established V's contact with sexually explicit material in his home and established that V possessed enough sexual knowledge to fabricate an abuse allegation; (4) they were relevant to show that Wimalasena did not adequately consider the effect of V's home life during V's forensic interview; and (5) the trial court's rulings "deprived defendant of the foundational evidence that his expert * * * needed in order to testify to the issues within the Jones family that investigators ignored."
The state contends that, with respect to the school records, only defendant's first three arguments are preserved for appellate review and, with regard to the DHS records, only his fourth argument is preserved. We agree with the state's preservation arguments. In both his written response to the motions to quash and in the hearings on those motions, defendant never argued that he sought the school or DHS records as foundational evidence for his expert witness. Thus that claim is entirely unpreserved. See State v. Ohotto , 261 Or. App. 70, 73, 323 P.3d 306 (2014). And, defendant's first three arguments were made only in connection with his request for the school records, while his fourth argument pertained only to his request for IA's DHS records. We therefore turn to the merits of the arguments that were preserved.
We begin with defendant's request for IA's DHS records and conclude that defendant failed to make a sufficient threshold showing that those records would disclose favorable and material evidence subject to disclosure under Brady . Defendant claimed that IA's DHS records contained information that IA had been physically and sexually abused, that IA had physically abused V, and that IA had brought pornography to school. He argued that those records were relevant to challenge the "integrity and completeness of the state's investigation," because they demonstrated that Wimalasena did not fully consider V's home life when she was interviewing V and evaluating V's disclosures of sexual abuse. However, defendant failed to demonstrate how IA's records were relevant to the adequacy of Wimalasena's interview with V. As the trial court noted, there is "no *738 provision that says that [a CAC] interviewer is supposed to go out on her own and seek independent corroboration" from other members of the victim's household. Defendant failed to explain how IA's confidential records could be used to cross-examine Wimalasena about the completeness of her interview with V, or how they were otherwise relevant to his theory of defense-that, under the influence of his mother, V had fabricated the abuse allegations because his family was angry with defendant for siding with the church after the Jones family had become embroiled in a conflict with church officials and been ousted from the congregation. Because defendant failed to make an initial threshold showing of materiality with regard to IA's DHS records, the trial court did not err in denying defendant's request for an in camera review of those records. *299 We arrive at a similar conclusion with respect to V's school records. In support of his request for V's school records, defendant claimed that those records would show that Jones had contacted the school and directed the school to prohibit any communication between V and members of the First Baptist Church. He claimed that that information was relevant to his defense because the underlying reason for the no-contact directive was "specific to this whole churning that was going on between the parents and the family and the church, of which they were pulling in [defendant] as part of, there's that antagonism and bias that goes to the heart of the underlying altercation in which this allegation arose." However, as the trial court found, defendant already possessed information about the no-contact directive in reports that he had obtained through pretrial discovery. Defendant failed to demonstrate a reasonable probability that V's school records contained qualitatively different information about the no-contact directive. At most, defendant demonstrated that the school records might confirm information that he already possessed. Thus, defendant failed to demonstrate that the information that he sought would be material under Brady .
Defendant also claimed that V's records might show that he exhibited behavioral changes between the date of the alleged abuse and the date of V's disclosure to Jones, and that V was on an IEP. He argued that that information *739 could be relevant to his defense and could be used to impeach Jones based on her statements to CAC that V was doing well in school. However, even if the school records disclosed that V was on an IEP, defendant failed to explain how that information could be relevant to his theory of defense. Nor did he explain how it could be used to impeach Jones. The mere fact that V may have been placed on an IEP does not mean that he was not doing well in school; indeed, the very purpose of an IEP is to help children succeed in school.
And, defendant's contention that V's school records might contain information about his behavioral changes was entirely speculative. When asked the basis for that belief, defense counsel stated:
"[W]e don't know when the disclosure was made, but we know it was sometime prior to October 2011. * * *
"During that time, if there were behavioral changes * * * by the child that are documented in the school records, those would be part of the IEP to show discipline or behavioral problems, that sort of thing. Because there's allegations that there were, at some point, behavioral changes, we need to know when those were because it could be when the incident occurred."
That showing was insufficient to demonstrate that the information sought was reasonably likely to be contained in V's school records, let alone that it would be material and favorable under Brady . Thus, the court did not err in denying defendant's request for an in camera review of V's school records.
However, we conclude that defendant did make a threshold showing sufficient to establish a reasonable belief that IA's school records contained material and favorable evidence. Defendant contended that those records would reveal that IA had been disciplined in school for "acting out sexually," and that IA had brought pornographic material to the school from home. Defendant argued that IA's behaviors could have had an effect on V's behavior and could have provided V with sufficient sexual knowledge to fabricate the allegation of abuse against defendant. In granting the motions to quash, the trial court concluded that the information that defendant sought to obtain from IA's school records *740 was irrelevant to the disputed issues at trial. We disagree. V's and Jones's credibility was a central issue at trial. If IA's school records did, indeed, contain the information that defendant sought-namely, that V had been exposed to pornographic materials at school, which IA had obtained from the home-they could be used to impeach both witnesses. That information also could be relevant to demonstrating that V possessed enough sexual knowledge to fabricate his allegations of abuse. Thus, defendant demonstrated that the information that he sought to obtain from IA's school records was information that would be material and favorable to his defense. *300 We conclude further that defendant made a sufficient showing that it was reasonable to believe that IA's school records contained the information that he sought. Defendant's contentions were based on emails and reports that he had received during pretrial discovery that included mandatory DHS referrals for school incidents involving IA and police reports relating to incidents that had taken place at the school. Defendant argued that the school's internal investigations were likely to contain a more complete record of those incidents, including details about the pornography incident. Based on the police and DHS reports regarding specific incidents at school, it is reasonably likely that IA's school records contained information related to those events, and that the information would be of a different quality than that received during discovery. See Lammi I , 278 Or. App. at 695-96, 375 P.3d 547 (defendant demonstrated a reasonable basis to think counseling records contained exculpatory evidence related to sexual abuse by showing that the victim made equivocal statements in an earlier counseling session about whether the abuse occurred and then resumed counseling soon after defendant's arrest); see also Tiner v. Premo , 284 Or. App. 59, 79, 391 P.3d 816, rev. den. , 361 Or. 886, 403 P.3d 767 (2017) (finding Brady violation when withheld impeachment evidence was material to central issues at trial and was qualitatively different from other evidence admitted at trial). We therefore conclude that defendant met his burden of making a threshold showing sufficient to establish that IA's school records would contain favorable and material evidence subject to disclosure under Brady. *741 We turn to the second step in the inquiry-whether the trial court should have exercised its discretion to conduct an in camera review of IA's school records,
"considering, among other things, 'the facts and circumstances of the particular case, the volume of materials at issue, the relative importance of information sought, and whether such information might be available from non-privileged sources.' "
Covington , 291 Or. App. at 519, 422 P.3d 276 (quoting Lammi II , 281 Or. App. at 99, 380 P.3d 1257 ). Although the trial court found that IA's school records were highly confidential and that much of the information defendant sought to obtain through the school records was already available to him through reports that he had received in pretrial discovery, it is apparent from the record that the court's ruling was primarily based on its determination that the information sought was irrelevant. It is not clear that the court engaged in an appropriate exercise of discretion in granting the motions to quash. In any event, to the extent that the court did engage in such an exercise, the court's balancing of factors was based on the incorrect premise that the information that defendant sought to obtain was not material or favorable to the defense. We therefore vacate the court's judgment and remand the case for the court to determine whether to conduct an in camera review of IA's school records for Brady material.
If, on remand, the trial court exercises its discretion to review IA's school records in camera , and that review discloses the existence of Brady material, then defendant is entitled to a new trial. However, if the court determines that the records do not contain Brady material, or if the court declines, in its exercise of discretion, to review the records in camera , then the court should reinstate the original judgment of conviction. Covington , 291 Or. App. at 521, 422 P.3d 276.
Vacated and remanded.

In his fourth through seventh assignments of error, defendant contends that the trial court erred when it excluded evidence of IA's behavioral problems, impermissibly commented on the evidence by questioning V in front of the jury, improperly limited the presentation of character evidence, and permitted the jury to view during its deliberations a video recording of V's forensic interview. We reject those assignments of error without discussion.

Immediately before trial, the state dismissed the second count of the indictment.

In his brief on appeal, defendant asserts that the trial court's rulings also violated his state and federal rights to confront witnesses against him and to compulsory process. However, defendant failed to develop his Confrontation Clause argument below and on appeal. And, as we have explained, compulsory-process review of a claim that the state withheld Brady evidence "is absorbed into the due process analysis" of the Fourteenth Amendment. State v. Zinsli , 156 Or. App. 245, 252, 966 P.2d 1200, rev. den. , 328 Or. 194, 977 P.2d 1172 (1998) ; see also State v. Bray , 281 Or. App. 584, 598-99, 383 P.3d 883 (2016), rev. allowed , 361 Or. 543, 397 P.3d 30 (2017). Thus, we focus our analysis on defendant's due-process arguments.