LAGESEN, J.
*713 This case involves an untimely, successive petition for post-conviction relief in which petitioner alleges that he is "actually innocent" of most, but not all, of the offenses to which he pleaded guilty nearly 30 years ago. It requires us to consider whether a post-conviction petitioner's claim of "actual innocence" can provide both a viable "freestanding" ground for post-conviction relief, as well as a basis for disregarding otherwise applicable legislative limitations on the availability of post-conviction relief and, if so, whether petitioner's allegations and the attached evidence in support of his claim of "actual innocence" are sufficient to permit this proceeding to go forward. Although we do not foreclose the possibility that a claim of actual innocence might provide a basis for post-conviction relief, even in the face of apparent legislative limitations on the pursuit of such a claim, we ultimately do not reach the question because, regardless of the availability of such a claim-either as a freestanding *1107 basis for post-conviction relief or as a mechanism for excusing other procedural defaults-petitioner's allegations and evidentiary showing of innocence fall far short of what, historically, has been required to challenge a conviction based on allegations of innocence. We therefore affirm the judgment of the post-conviction court dismissing the petition.
I. BACKGROUND
A. Underlying Charges and Trial Court Proceedings
Petitioner was indicted in June 1991 for eight crimes related to the murder of Earnest William Johnson: aggravated murder, intentional murder, felony murder (three counts), first-degree robbery, first-degree kidnapping, and second-degree assault. In September 1992, petitioner pleaded guilty to four of those charges-one of the felony murder counts, first-degree robbery, first-degree kidnapping, and second-degree assault-in exchange for dismissal of the remaining counts.
In an affidavit filed as part of the plea process, petitioner described the acts underlying his plea:
"On or about June 19, 1991, acting with four other persons, I did unlawfully and intentionally participate in the *714 robbery by force of Earnest William Johnson, and, in the furtherance thereof, said Johnson was killed by another participant in the robbery. Further, in the course thereof, I did cause physical injury to Johnson by striking him with a metal pipe, a dangerous weapon, and said Johnson was moved with intent to interfere substantially with his personal liberty by other participants with intent to rob him after I had rendered Johnson injured by striking him with the metal pipe."
At the plea hearing, the court and the parties primarily focused on the theory that petitioner's act of striking Johnson with the metal pipe had set in motion the events culminating in the murder. When the court asked petitioner whether he had committed the acts alleged in the murder charge, petitioner responded, "Somewhat, yeah, I guess I'm responsible in a way"; at that point, his counsel asserted that the factual recital for his plea "does adequately cover that for legal purposes."
Petitioner then explained, "On the robbery part, you know, I never took nothing from the victim at the scene. But, you know, so I'm not clear on the robbery, but I guess I'm a participant." Upon further inquiry from the court, petitioner stated that he did not know that the other participants were robbing Johnson, but he acknowledged that "[a]t some point during this whole episode" he did "realize they were robbing Mr. Johnson."
The court then inquired as to the robbery and kidnapping counts, and the discussion again turned to the degree of petitioner's involvement in the episode. As the court described the robbery charge, petitioner's counsel interjected that "[h]e had a metal pipe to which he hit Mr. Johnson just prior to the robbery, and was clearly an aider and abettor in the course of the robbery and did receive the fruit of the robbery following that act." Likewise, with regard to kidnapping, petitioner's counsel explained:
"Again, if I may, Your Honor, he did not personally remove Mr. Johnson. What he did was strike him with the pipe, which made the rest of the event possible. Mr. Johnson was then moved some 60 to 100 feet, and against his will and held thereafter, being robbed, beaten, and killed by other participants."
*715 After petitioner continued to deny that he had taken anything from Johnson at the scene or kidnapped him, he and his counsel conferred about the basis for the plea, resulting in the following exchange:
"[PETITIONER'S COUNSEL]: I've explained to my client that his act of striking Mr. Johnson made possible the kidnap of Mr. Johnson by the other participants, and to that extent he was aiding and abetting, and I believe he agrees with that .
"THE COURT: Do you agree with that, [petitioner]?
"[PETITIONER]: Yes sir."
(Emphasis added.)
The court then asked the prosecutor whether he believed that there was a sufficient *1108 factual basis for the plea. The prosecutor asserted that petitioner's admissions were sufficient to establish a basis for the plea but also that petitioner was not "being fully accurate with respect to the facts he's giving to the Court." The prosecutor then stated:
"I think he clearly was an aider and abettor from start to finish, and the amount he's able to admit to constitutes sufficient basis for him changing his plea. But I'm not accepting his representations as being accurate with respect to the other involvement in the crime."
The court ultimately accepted petitioner's plea to the charges and scheduled a sentencing hearing.
At sentencing, the state presented two witnesses who testified about petitioner's involvement in the crimes. The first, who had been jailed in a holding cell with petitioner, testified that petitioner had admitted that he and four others had killed someone who had been "bullying" and "punking" petitioner at a homeless shelter where they had been staying. He testified:
"And [petitioner] explained to me they got him far enough away [from the shelter] that this fellow, who had been bullying him, had noticed he had a lead pipe. And at that time he told me that he started swinging and cracking him with it. And he said he got him and he was going *716 to do him. And after he had started, he told me that him and these other fellows all jumped in and were all beating him, and they continued and made sure that the job was done."
The state's next witness, Thomas Seitz, was one of the other individuals who had been charged with Johnson's murder. Seitz had pleaded guilty to murder by that point, and he testified that he and four others-petitioner, John Soller, Scott Robinson, and Scott Chandler-had met in Portland and formed a group known as the Ranger Riders. Chandler had been the leader, and petitioner ranked third in the group. They had decided to travel south, hopped a train, and ended up in Eugene at the Mission, a homeless shelter. According to Seitz, they met Johnson at the Mission and invited him to join their group.
Seitz testified that the group left the shelter that same evening and ended up at a park by a river. At the park, Robinson approached Seitz and told him that petitioner was going to follow Johnson around a tree and hit him with a pipe, at which point the others were to grab Johnson and hold him. He testified that, about five minutes later, they carried out that plan. He watched petitioner go around a tree, saw him swing a lead pipe, and heard a smack; at that point, the others went around the tree and grabbed Johnson's hands and feet, Chandler pulled out a knife and threatened Johnson, and they tied him up.
According to Seitz, he acted as a lookout while the others carried Johnson down to the river bank.[1] He testified that petitioner returned covered with blood, and that Soller and Chandler also returned with blood on them. Seitz explained that Johnson's property was divided up after the murder, and that petitioner received a blue bag, some clothes, and a tarp.
After considering the evidence presented, the trial court imposed consecutive sentences on each of the four *717 counts, for an aggregate sentence of 534 months in prison, along with lifetime post-prison supervision.[2]
B. Previous Post-Trial Proceedings
Petitioner filed a direct appeal, and this court affirmed. State v. Reeves , 134 Or. App. 38, 894 P.2d 1170, rev. den. , 321 Or. 284, 896 P.2d 1213 (1995). The following year, petitioner filed a petition for post-conviction relief; the court denied relief, and we affirmed that judgment. Reeves v. Armenakis , 164 Or. App. 318, 991 P.2d 66 (1999), rev. den. , 330 Or. 281, 6 P.3d 1099 (2000). Thereafter, petitioner *1109 initiated a habeas corpus proceeding in federal district court, which the court dismissed.
C. Present Post-Conviction Proceeding
In 2014, petitioner initiated the present post-conviction proceeding after obtaining an affidavit from one of his codefendants, Soller, who had been sentenced to life without the possibility of parole for his role in Johnson's murder. In that affidavit, which was attached to the petition for relief, Soller described the circumstances of the murder as follows:
"On June 19, 1991, the five of us [Soller, petitioner, Robinson, Seitz, Chandler, and Johnson] left the Eugene Mission together and walked along a bike path near a river.
"At one point, [petitioner] hit Johnson in the head once with a metal pipe he had on him. After hitting Johnson, [petitioner] did not do anything else. Johnson was awake and talking after Reeves hit him.
"I had a knife on me and Scott Chandler was yelling 'cut him, cut him.' I cut Johnson's throat and he died.
"Scott Chandler and I may have moved Johnson's body but [petitioner] had nothing to do with this and [petitioner] never moved Johnson's body while he was alive or after he died.
"There is no way that [petitioner] could have known I was going to kill Johnson because I didn't even know that I was going to kill him. It was a spontaneous decision that I made at the time.
*718 "As far as I know, there was never a plan to rob or kidnap Johnson. We did divide some of his property after he was dead but I didn't kill him to take his property.
"At no time was there ever any plan to rob or kidnap Johnson. No one agreed to rob or kidnap him before he was murdered and no one agreed to murder him in order to cover up any crime."
(Paragraph numbering omitted.) Soller added that he pleaded guilty "because I wanted to avoid the death penalty," and that he had "asked the Governor to grant me clemency" so that he would not die in prison; he explained that he requested clemency rather than a pardon "because I am guilty of murder."
Petitioner's current post-conviction petition relies on Soller's affidavit in two different ways. First, he alleges that the affidavit "corroborates" his first specification for relief, which is a standalone assertion of his actual innocence. In that specification, petitioner alleges that he "is actually innocent of the convictions for felony murder, robbery in the first degree, and kidnapping in the first degree," and that a "conviction imposed upon an actually innocent person violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution" and is therefore void.
Second, the petition relies on Soller's affidavit to excuse what he acknowledges is the untimely and successive filing of various other specifications of relief. In those other specifications, petitioner alleges that his guilty plea to the charges was invalid and a product of his trial counsel's poor representation and the looming possibility of the death penalty; that the trial court entered separate convictions and imposed consecutive sentences for murder, robbery, and kidnapping-totaling more than 44 years in prison-that were excessive and unconstitutional; and that his trial counsel had provided inadequate and ineffective assistance throughout the investigation, plea, and sentencing of the charged offenses.
In response to the petition, the superintendent moved to dismiss, arguing that claims of actual innocence neither excused petitioner's late and successive filing nor provided an independent ground for relief. In the superintendent's *719 view, a claim of actual innocence is the proper subject of a request for executive clemency, not post-conviction relief. But in any event, the superintendent contended, each of the alleged specifications of relief-including actual innocence-were based on facts within petitioner's knowledge long before Soller's affidavit, and each specification either had been raised or could have been raised in a timely petition.
The post-conviction court agreed with the superintendent that each of the specifications could have been raised earlier, including the actual-innocence claim. The court explained:
*1110 "[R]egarding allegation one, the actual innocence, which I think is, goes towards both allegation one and then an argument towards the escape clause, * * * actual innocence as an allegation itself could have been raised in the original PCR and certainly could have been raised at trial, but it was waived and a guilty plea was had instead. I don't think this is an issue here where this Court would decide someone is actually innocent."
The court then entered a judgment granting the superintendent's motion and dismissing the petition, which petitioner now appeals.
On appeal, petitioner contends that actual innocence is not only a cognizable claim in itself, but it also excuses any procedural default on other claims. Oregon Innocence Project, appearing amicus curiae , argues that the post-conviction court erred in failing to recognize a freestanding claim of actual innocence, and it asks us to explicitly do so. The superintendent responds that the petition is time barred, that petitioner's claim of "actual innocence" is not "legally cognizable" under the Post-Conviction Hearing Act, and that, in all events, "even if procedurally proper and legally cognizable, petitioner's allegations would be legally insufficient to satisfy the stringent criteria that would apply to any such hypothetical claim."
II. ANALYSIS
Petitioner's appeal presents two questions that appear to be ones of first impression for this court: First, what post-conviction relief, if any, can a petitioner seek in *720 state court based on a claim that newly discovered evidence demonstrates the petitioner's actual innocence? Second, and relatedly, what showing must a petitioner make to establish actual innocence if such claims are cognizable? Although we ultimately decide this case based solely on our answer to the latter question, we discuss both to provide context for our analysis.
A. Oregon Post-Conviction Remedies-Sources of Law
1. History of post-conviction claims of innocence
We begin with a brief overview of post-conviction remedies in Oregon. The scheme that now governs state post-conviction relief claims, the Post-Conviction Hearing Act (PCHA), was enacted in 1959. See generally Bartz v. State of Oregon , 314 Or. 353, 839 P.2d 217 (1992) (describing the history of the PCHA). Before its enactment, Oregon had a "complex and confusing array of post-conviction remedies, including writs of habeas corpus (as provided both in the Oregon Constitution and in statutes), writs of coram nobis, motions to correct the record, and motions to vacate the judgment." Id. at 362, 839 P.2d 217. The PCHA was intended to "provide a detailed, unitary procedure to persons seeking post-conviction relief." Id.
To that end, the PCHA describes the forms of relief that may be granted, ORS 138.520, as well as the substantive bases for relief, ORS 138.530. The latter statute provides, in part:
"(1) Post-conviction relief pursuant to ORS 138.510 to 138.680 shall be granted by the court when one or more of the following grounds is established by the petitioner:
"(a) A substantial denial in the proceedings resulting in petitioner's conviction, or in the appellate review thereof, of petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void.
"(b) Lack of jurisdiction of the court to impose the judgment rendered upon petitioner's conviction.
"(c) Sentence in excess of, or otherwise not in accordance with, the sentence authorized by law for the crime *721 of which petitioner was convicted; or unconstitutionality of such sentence.
"(d) Unconstitutionality of the statute making criminal the acts for which petitioner was convicted."
The PCHA then states that it is the exclusive means of challenging the lawfulness of a criminal judgment outside of direct appeal, and it abolishes all preexisting common-law forms of post-conviction relief except habeas corpus. ORS 138.540(1) ("With the exception *1111 of habeas corpus, all common law post-conviction remedies, including the motion to correct the record, coram nobis, the motion for relief in the nature of coram nobis and the motion to vacate the judgment, are abolished in criminal cases.").
From the time that it was enacted, there were questions as to whether the PCHA addressed claims of factual mistake based on newly discovered evidence-and the extent to which the PCHA altered the remedies available under preexisting law to a convicted person seeking to establish innocence through evidence discovered after the person's criminal trial. Two lawyers who participated in drafting the bill that became the PCHA, Jack Collins and Carl Neil, authored a law review article shortly after the act was adopted. In it, they suggested that innocence claims predicated on newly discovered evidence of innocence were not covered by the act unless the evidence had been withheld from the petitioner by the prosecutor in a manner that violated the Fourteenth Amendment:
"Newly discovered evidence is not a ground for relief under the act. Such evidence may constitute grounds for a new trial, but the time limit for new-trial motions is quite short. Where the newly discovered evidence would prove the conviction invalid under the fourteenth amendment, as in the case of perjured testimony knowingly used by the prosecutor, it would no doubt constitute grounds for relief under [ ORS 138.530(1)(a) or (b) ]. However, occasionally a conviction, procedurally regular in all respects and supported by otherwise substantial evidence, can later be shown to be erroneous and innocence established. Unless the conviction of an innocent man through fair procedure and on otherwise sufficient evidence is regarded as an abridgement *722 of constitutional rights, there is presumably no judicial relief available to correct the wrong after the time for a motion for new trial has expired. "
Jack G. Collins and Carl R. Neil, The Oregon Postconviction-Hearing Act , 39 Or. L. Rev. 337, 346-47 (1960) (footnotes omitted; emphasis added).
Collins and Neil observed that one of the remedies abolished by the PCHA, coram nobis , "might have been available" in the case of newly discovered evidence establishing innocence. 39 Or. L. Rev. at 347. Coram nobis , which we discuss later in more detail, was a procedural tool to correct errors of fact in judicial proceedings, and it functioned as a delayed motion for a new trial. See State v. Poierier , 212 Or. 369, 372, 320 P.2d 255 (1958) (so characterizing a motion in the nature of coram nobis ). However, Collins and Neil noted that the PCHA "forecloses this possibility by abolishing coram nobis in criminal cases." 39 Or. L. Rev. at 347. Because "[t]he prospect of a court holding itself powerless to remedy an erroneous conviction when it is later shown than another person committed the crime is not pleasant," and because claims based on newly discovered evidence involve different policy considerations from unfairness during the course of a trial, Collins and Neil suggested that "[t]he problem of newly discovered evidence should be the subject of additional legislation." Id.
More than a half century has passed, and the legislature has not enacted such additional legislation or amended the text of ORS 138.530. Thus, the statutory bases for relief under the PCHA remain essentially as they were in 1959-with no more clarity as to whether the PCHA provides a mechanism for advancing a claim of innocence based on newly discovered evidence.
2. Sources of law identified by the parties
With that backdrop, we return to the contentions raised in this appeal, many of which echo the questions posed by Collins and Neil. Petitioner contends that claims of actual innocence-what he defines as a petitioner's "factual innocence of his or her crime of conviction"-based on newly discovered evidence must be recognized under the PCHA, both as a freestanding ground for relief and as a basis for *723 excusing an untimely or successive petition. His argument with regard to a freestanding claim is based on the following premises: (1) The PCHA establishes that a substantial denial of a petitioner's *1112 constitutional rights in the underlying criminal proceedings or an unconstitutional sentence are bases for post-conviction relief, see ORS 138.530(1)(a) and (c). (2) Article I, section 16, of the Oregon Constitution and the Eighth Amendment to the United States Constitution prohibit the conviction and punishment of an innocent person. And, (3) the PCHA allows a petitioner to raise an untimely or successive ground for relief based on newly discovered evidence, see Bartz , 314 Or. 353, 839 P.2d 217. From those premises, petitioner reasons that actual innocence is a basis on which to grant post-conviction relief under the PCHA, and newly discovered evidence of innocence allows that ground to be raised in an otherwise untimely or successive petition.[3]
In its amicus brief, Oregon Innocence Project proposes a similar path to a freestanding claim of actual innocence based on newly discovered evidence, although it identifies a different source of the "substantial denial in the proceedings resulting in petitioner's conviction" for purposes of ORS 138.530(1)(a). In addition to arguing, as petitioner does, that sentencing an innocent person to prison violates Article I, section 16, Oregon Innocence Project points to Article I, section 10, of the Oregon Constitution, which provides:
"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."
Oregon Innocence Project argues that the drafters of Article I, section 10, would have understood the remedy clause to protect the writ of coram nobis in particular;[4] and, *724 furthermore, that if a petitioner successfully demonstrates that he is innocent of the crimes of conviction, "it follows that his right (and the public's interest) in 'complete justice' was denied in the original proceeding."
In response, the superintendent presents a far more restricted view of the relief afforded by Oregon's post-conviction statutes and the state and federal constitutions with respect to actual innocence. First, the superintendent reiterates that petitioner's actual-innocence claim is procedurally barred because it "rests on facts that always have been available to him: his personal role in his crimes of conviction"; therefore, the ground for relief could have been raised earlier, and the discovery of new evidence in support of that ground for relief does not trigger the escape clause. See Freeman v. Gladden , 236 Or. 137, 139, 387 P.2d 360 (1963) (holding that the petitioner's argument for application of the escape clause had "confuse[d] new or additional evidence with new or additional grounds " for relief (emphases in Freeman ) ). And, the superintendent argues, that reasonable time limitation comports with due process, see Bartz , 314 Or. at 368, 839 P.2d 217, and no principle of law enables petitioner to raise an actual-innocence claim after that limitation period expires.
Procedural barriers aside, the superintendent also disputes the predicate for petitioner's claim-that actual innocence constitutes an independent, underlying constitutional violation for purposes of ORS 138.530(1)(a) or (c). The superintendent acknowledges that, for purposes of the federal constitution, habeas courts recognize so-called "gateway" actual-innocence claims-that is, a showing of innocence that excuses procedural default on claims of constitutional error. See Murray v. Carrier , 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) ("[W]e think that in an extraordinary case, where a constitutional violation *1113 has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."); *725 Schlup v. Delo , 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ("To satisfy the Carrier gateway standard, a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."). But, the superintendent argues, the United States Supreme Court has never recognized a freestanding claim based on newly discovered evidence: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding," because "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact ." Herrera v. Collins , 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (emphases added). And, to the extent the Court has assumed for the sake of argument that the Eighth Amendment could provide a basis for a freestanding claim of actual innocence, it has only done so in cases in which an innocent person could be executed; it has never employed that same assumption in a noncapital case. See McQuiggin v. Perkins , 569 U.S. 383, 392, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence.").
As for the state constitution, the superintendent asserts that, far from assuming that an actual-innocence claim might exist, "Oregon case law reflects 'an implicit understanding that the "criminal justice system simply does not have a mechanism for determining actual innocence." ' " (Quoting State v. Romero , 274 Or. App. 590, 597, 360 P.3d 1275 (2015), rev. den. , 358 Or. 794, 370 P.3d 502 (2016) (quoting Stevens v. Bispham , 316 Or. 221, 257, 851 P.2d 556 (1993) (Unis, J., concurring) ) ). See also Anderson v. Gladden , 234 Or. 614, 625-26, 383 P.2d 986 (1963), cert. den. , 375 U.S. 975, 84 S.Ct. 485, 11 L.Ed.2d 420 (1964) ("As a general rule, habeas corpus (or its statutory counterpart in post-conviction proceedings) does not provide relief from a conviction resulting from a mistake of fact, where proof of the jury's mistake must depend upon the credibility of newly discovered evidence.").[5]
*726 Because we resolve this case on other grounds, we do not decide whether and under what circumstances a claim of "actual innocence" might supply the basis for a grant of collateral relief from a conviction. However, we make two observations on the point. The first is that the Oregon authorities cited by the superintendent are not directly controlling with regard to the availability of an actual-innocence claim. Our observation in Romero about a judicial mechanism for determining innocence was part of an effort to ascribe meaning to the term "actual innocence" in a post-conviction statute concerning DNA testing, ORS 138.692. We did not examine whether Oregon courts can entertain actual-innocence claims under any of the sources of law identified by petitioner or Oregon Innocence Project; and, in any event, we followed that observation with an examination of ways that courts have, in fact, formulated tests to assess claims of innocence in order to avoid a miscarriage of justice. See 274 Or. App. at 598-99, 360 P.3d 1275 (describing the Schlup test).
Similarly, the Supreme Court's dicta in Anderson about the availability of a post-conviction remedy based on newly discovered evidence was expressly qualified ("[a]s a general rule") and does not reflect a considered examination of the sources of law raised in this case. If anything, the opinion in Anderson reflects the court's reluctance to close the door on such claims:
"The prospect of a court holding itself powerless to remedy a manifestly erroneous conviction obviously would not adorn the administration of justice. We do not, therefore, say that executive clemency is the only remedy available when newly discovered *1114 evidence proves the innocence of a prisoner. That hypothetical state of affairs, however, is not now before us. We leave open the question whether newly discovered evidence can ever give rise to any kind of common-law post-conviction judicial relief. Cf. Collins and Neil in 39 Or. L. Rev. at 346-47, where it is suggested that further legislation might be necessary in order to provide a remedy within the framework of our present statutory post-conviction procedure."
234 Or. at 626, 383 P.2d 986.
That leads us to our second observation, which is intertwined with our decision not to address conclusively *727 the availability of an actual-innocence claim in this case: As the Supreme Court suggested in Anderson , and Collins and Neil did before that, this is a natural subject for legislative action before courts are forced to define the scope of constitutional remedies or confront questions as to their inherent authority. Although our criminal justice system is designed both to prevent and to correct erroneous convictions, it is imperfect. As developments in physical and behavioral science and technology have increased our understanding of those imperfections, the legislatures of many states, including Oregon, have enacted statutory mechanisms to address the possibility of "actual innocence." For instance, our legislature has enacted specific statutes to request the performance of DNA testing if, among other requirements, "[t]he motion is made for the purpose of demonstrating the innocence of the person of the offense and not to delay the execution of the sentence or administration of justice," and "[t]here is a reasonable possibility, assuming exculpatory results, that the testing would lead to a finding that the person is actually innocent of the offense for which the person was convicted." ORS 138.692(4)(c), (d).
Other jurisdictions have enacted legislation to address post-conviction claims of actual innocence based on new evidence more generally, without limiting such claims to those based on new DNA evidence, and have set standards of proof for those claims. See, e.g. , Ariz. R. Crim. P. 32.1(e), (h) (providing a post-conviction remedy based on newly discovered evidence and a remedy where "the defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would find the defendant guilty beyond a reasonable doubt, or that the death penalty would not have been imposed"); D.C. Code Ann. § 22-4135 (providing for a motion for relief from judgment based on actual innocence that "may be made at any time");[6] Md. Crim. Proc. § 8-301 (setting forth requirements for petition for writ of *728 actual innocence); Minn. Stat. Ann. § 590.01 (providing an exception to ordinary time for filing post-conviction petitions where newly discovered evidence "establishes by a clear and convincing standard that the petitioner is innocent of the offense or offenses for which the petitioner was convicted"); Mont. Code Ann. § 46-21-102 (providing a similar exception); Utah Code Ann. § 78B-9-402 (describing petition for determination of "factual innocence" based on newly discovered evidence).
There remains the possibility that our legislature will further legislate on this subject, obviating the need for us or the Supreme Court to confront the complicated questions of constitutional law implicated by a claim of actual innocence, while at the same time providing us with the guidance of the legislature's considered judgment on the matter. As Justice Linde observed, "[T]here is no need for a court to freeze details into constitutional law when guidance can be found in [statutes] that can be further considered and refined by the ordinary lawmaking process." State v. Smith , 301 Or. 681, 713, 725 P.2d 894 (1986) (Linde, J., dissenting). Although there are circumstances in which the interests of *1115 justice would necessarily require us to confront those complicated constitutional questions head on, without waiting for the assistance of the legislature before "freez[ing] details into constitutional law," this, as we explain, is not such a case.
B. Standard of Proof for Actual Innocence
As an alternative argument, the superintendent contends that, "[e]ven if actual innocence were a basis for post-conviction relief, petitioner's evidence here-even if credited-does not meet the 'extraordinarily high' standard that courts have employed when assessing such hypothetical claims." We agree. Petitioner's allegations and "new" evidence of innocence fall far short of what has been required historically, and is required by the other courts today, to challenge a conviction based on new evidence of actual innocence.[7]
*729 As petitioner and Oregon Innocence Project both acknowledge, claims based on newly discovered evidence of innocence-which is what we understand petitioner to have pleaded in this case-are predicated on "factual innocence" as opposed to "legal innocence."[8] See Bousley v. United States , 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (" '[A]ctual innocence' means factual innocence, not mere legal insufficiency."); see also Leah M. Litman, Legal Innocence and Federal Habeas , 104 Va. Rev. 417 (2018) (describing conceptual similarities between legal innocence and factual innocence and arguing that habeas relief can and should be made available to legally innocent defendants). That acknowledgment poses a significant hurdle for petitioner. That is because petitioner's "new" evidence of innocence, when viewed in the light of the record created at the time of petitioner's plea and sentencing, at most calls into question the legal sufficiency of the factual basis for petitioner's plea. What it lacks, when viewed in the context of the entire record, is the sort of exculpatory force required, historically, to secure the remedy of coram nobis based on new evidence of actual innocence, and, contemporaneously, by courts that have recognized that a showing of actual innocence can either excuse a procedural default or supply a freestanding basis for collateral relief from a conviction.
As noted above, petitioner claims that his new evidence shows that he is actually innocent of felony murder, first-degree robbery, and first-degree kidnapping because *730 the new evidence would support an inference that he did not know about the plan to rob, kidnap, or kill Johnson, and that, after he struck Johnson with the metal bar, he did not "strike him again, restrain him, take his property, move him, kill him, or encourage anyone else to do those things." That is, he admits that he was guilty of assaulting Johnson with the metal pipe but asserts that he was innocent of the other crimes.
The problem for petitioner is that his convictions were not based on whether, as a matter of fact , he intended to rob, kidnap, or kill Johnson, or even whether he committed any further acts at the scene of the crime after striking him in the head. The convictions were predicated on whether he was criminally responsible for having set in motion *1116 those crimes by intentionally striking Johnson with the metal pipe. In his affidavit in support of the plea, petitioner admitted that he intentionally "participate[d]" in the robbery, that, in the course thereof, he "str[uck] him with a metal pipe," and that "Johnson was moved with intent to interfere substantially with his personal liberty by other participants with intent to rob him after I had rendered Johnson injured by striking him with the metal pipe ." (Emphasis added.) At the plea hearing, petitioner expressly disclaimed intent to commit the murder, robbery, or kidnapping, but he expressed a willingness to plead based on his degree of participation in each of those crimes as an accomplice.
Specifically, petitioner explained at the plea hearing that he was not clear about the robbery charge because he had not taken anything from Johnson at the scene, but then stated, "but I guess I'm a participant." His counsel later interjected, with regard to that count, that "[h]e had a metal pipe to which he hit Mr. Johnson just prior to the robbery and was clearly an aider and abettor in the course of the robbery and did receive the fruit of the robbery following that act." (Emphasis added.) Likewise, with regard to kidnapping, petitioner disclaimed any direct involvement, but he agreed to plead guilty after his counsel explained to him that "his act of striking Mr. Johnson made possible the kidnap of Mr. Johnson by the other participants, and to that extent he was aiding and abetting ." (Emphasis added.)
*731 And with regard to the murder count, petitioner acknowledged that he was "responsible in a way," while his counsel affirmed that the plea "does adequately cover that for legal purposes."
Those admissions about his degree of involvement as an accomplice-hitting Johnson with the pipe just before the robbery, receiving some of the stolen property, and setting in motion the kidnapping and murder-were accepted by the prosecutor, which he represented to the court constituted a legally sufficient basis for the plea. The prosecutor maintained that petitioner had minimized his role, but nonetheless stated that petitioner "clearly was an aider and abettor from start to finish, and the amount he's able to admit to constitutes sufficient basis for him changing his plea." (Emphasis added.)
In support of his actual-innocence claim, petitioner does not suggest that his own factual representations at the plea hearing were incorrect; indeed, he offers Soller's affidavit to corroborate that version of events. Rather, petitioner asserts that his attorney, the judge, and the prosecutor "all told me that I was legally guilty of those crimes [murder, kidnapping, and robbery] even if they accepted my version of what happened . That did not make sense to me, but I trusted them so I pleaded guilty to those crimes." (Emphasis added.)
In other words, the crux of petitioner's innocence claim is that his version of events-both then, and now as supported by Soller's affidavit-shows that he is guilty of assault but was not sufficiently involved in the rest of the attack to be guilty of the murder, kidnapping, or robbery. That is a contention that turns on a correct application of the law, not on a different version of the underlying facts known at the time of petitioner's plea. In short, it is an argument that petitioner is legally innocent, not factually innocent of the crimes for which he was convicted. See Bousley , 523 U.S. at 623, 118 S.Ct. 1604 (drawing that distinction). But, again, petitioner has acknowledged in this case that it is factual innocence, not legal innocence, that he must demonstrate.
In any event, setting aside the fact that petitioner's arguments appear more directed to legal innocence than *732 factual innocence, to the extent that petitioner raises a claim of factual innocence, his allegations and evidence fall short of the exacting standard of proof that would govern such a claim, whether under the remedies clause of our constitution directly or derivatively through the PCHA based on the notion of a constitutionally grounded claim of innocence.
First, to the extent our constitution may protect the right of a convicted person to collaterally challenge a conviction based on new evidence of actual innocence, we think that remedy likely would take the form of coram nobis , a remedy that, historically, demanded proof of an extraordinary circumstance *1117 of innocence based on newly discovered evidence. Although the precise historical contours of coram nobis are difficult to map,[9] the writ of coram nobis , or "motion in the nature of coram nobis ," was an elastic but extraordinary remedy to correct mistakes of fact that occurred at trial. See Poierier , 212 Or. at 374, 320 P.2d 255 (explaining that, "[w]henever the writ of coram nobis has been recognized to invoke the jurisdiction of a trial court, it has been only under very unusual circumstances, and then only if it appears from the petition that the facts tendered as a basis for a new trial would have prevented the judgment entered, and also that the facts tendered were unknown at the time of the trial and it was through no lack of diligence or reasonable care on the part of the defendant that they were not presented").
In State v. Huffman , 207 Or. 372, 297 P.2d 831 (1956), the court traced some of the history of the ancient writ of coram nobis .[10] In doing so, the court cited and quoted cases *733 from the Indiana Supreme Court, including State ex rel. Lopez v. Killigrew , 202 Ind. 397, 174 N.E. 808 (1931), which tied coram nobis to Indiana's remedy clause-the source of Oregon's similarly worded provision:
"The writ of error coram nobis is a recognized remedy of our legal procedure. * * * The Constitution of Indiana requires that all courts shall be open and that 'every man, for injury done him in his person, property or reputation shall have remedy by due course of law.' The writ coram nobis is a part of our 'due course of law [.]' "
Huffman , 207 Or. at 405, 297 P.2d 831 (quoting Killigrew , 174 N.E. at 809 (emphasis added) ).[11] At the same time, Huffman quoted another case, Anderson v. Buchanan , 292 Ky. 810, 168 S.W.2d 48, 53 (1943), that emphasized the extraordinary nature of that remedy, and the competing interests that must be balanced when determining a standard of proof. The court recognized " 'the need for ending litigation of every kind, particularly of criminal prosecutions, as early as is consistent with right, and that no one should be permitted to have de novo trial after trial ad infinitum,' " as well as the possibility that " 'one whose life or liberty is at stake may fabricate evidence and call it newly discovered, or have a prosecuting witness repudiate his testimony and allege perjury in order to obtain a new trial or perhaps only a reprieve.' " Huffman , 207 Or. at 403, 297 P.2d 831 (quoting Anderson , 168 S.W.2d at 53 ). The "real purpose of the writ," as described *1118 in Anderson , was to " 'revest the *734 court with jurisdiction in an extreme emergency and permit inquiry into the important question of whether the judgment of conviction should be vacated because the defendant was unknowingly deprived of a defense which would have probably disproved his guilt and prevented his conviction, and if that probability be established to grant the defendant a new trial of the accusation . 31 Am. Jur., Judgments, 812 ; 24 C.J.S., Criminal Law, § 1606.' " Huffman , 207 Or. at 403-04, 297 P.2d 831 (quoting Anderson , 168 S.W.2d at 53 ; (emphases added) ).
After exploring those and other coram nobis cases, the court in Huffman reversed a trial court's ruling that it lacked jurisdiction to consider the defendant's motion in the nature of coram nobis . 207 Or. at 413, 420, 297 P.2d 831. However, the court offered pertinent observations about "the difficult task of the judiciary" when constitutional issues require the courts "to weigh competing and apparently conflicting rights and interests of the individual and of the state, and to put the scales in balance, harmonizing so far as possible the rights and duties of each." Id. at 417, 297 P.2d 831. The court noted the "extension throughout the United States of the opportunities afforded by habeas corpus and coram nobis to convicted persons to challenge judicial action if it appears to violate the fundamental rights of the individual" when, at the same time, "the books and judicial records are full of proof of the disgraceful abuse by convicts of the rights which the law has extended to them." Id. at 417-18, 297 P.2d 831. Huffman further observed that "courts have repeatedly cried out against these abuses by the many of the remedies which must be preserved for the protection of the few who have actually suffered wrong by the miscarriage of essential justice," and that "[t]he practical administration of justice requires as never before that criminal trials must be brought to an end" because "[t]he vacating of judgments long after evidence has been lost, witnesses have died or memories have failed, in itself involves grave danger of a miscarriage of justice." Id. at 418, 297 P.2d 831. After those observations, the court stated:
"We have recognized the power and jurisdiction of trial courts, in rare and extraordinary cases, to re-examine by coram nobis the validity of judicial processes which have resulted in convictions long since imposed . We do not propose to open the gates to a flood of litigation which will clog *735 the dockets of the courts, as has resulted from our extension of the scope of habeas corpus."
Id. (emphasis added).
In light of Huffman , other cases, and treatises that have attempted to circumscribe coram nobis , we understand that remedy to have evolved as one of last resort. That is, the writ of coram nobis or motion in the nature of coram nobis is a "rare" and "extraordinary" remedy that allows courts to avoid manifest injustice or fraud on the court. Id. ; see also Poierier , 212 Or. at 374, 320 P.2d 255 (explaining that the extraordinary remedy of coram nobis is available "only if it appears from the petition that the facts tendered as a basis for a new trial would have prevented the judgment entered").[12]
*1119 Second, even apart from a remedy in the nature of coram nobis , our Supreme Court, like courts in other jurisdictions, has long explained that reopening cases on the basis of newly discovered evidence is disfavored because of the manifest potential for endless litigation. See, e.g. , State v. Davis , 192 Or. 575, 579, 235 P.2d 761 (1951) ("Applications for a new trial on the ground of newly discovered evidence *736 are not favored, are viewed with distrust and construed with great strictness."); Territory v. Latshaw , 1 Or. 146, 147 (1854) ("In deciding motions for new trials, on account of newly discovered evidence, courts have found it necessary to apply somewhat stringent rules, to prevent the almost endless mischief which a different course would produce. In criminal cases, especially, would this be the case."). Oregon courts have also routinely held that newly discovered evidence must do more than impeach the testimony of a codefendant or accomplice before a verdict will be overturned. In Anderson , 234 Or. at 625-26, 383 P.2d 986, the court explained the limited value of that type of newly discovered evidence in the post-conviction posture:
"[The petitioner] contends that he is entitled to another trial because of newly discovered evidence that there was perjury in his first trial. A convict in another prison, one Garcia, has made equivocal affidavits that tend to cast some doubt on testimony he gave for the state in [the petitioner's] original trial. The affidavits do not, however, suggest that [the petitioner] did not kill Miller, or that some other person did. The most that can be said for the affidavits is that Garcia either lied when he said at [the petitioner's] trial that he saw [the petitioner] kill Miller, or he is lying now when he says he did not see [the petitioner] kill Miller.
"As a general rule, habeas corpus (or its statutory counterpart in post-conviction proceedings) does not provide relief from a conviction resulting from a mistake of fact, where proof of the jury's mistake must depend upon the credibility of newly discovered evidence."
See also State v. Adams , 91 Or. App. 24, 30, 754 P.2d 1 (1988) ("The new evidence impeaches and contradicts [one accomplice's] corroboration of [another accomplice]. If that is all that it could do, it is not sufficient to require a new trial."); accord. ORS 10.095(4) (jury may be instructed that "[t]he testimony of an accomplice ought to be viewed with distrust, and the oral admissions of a party with caution"). The standard for any cognizable actual-innocence claim under Oregon law, whether based on underlying constitutional or common-law principles, would necessarily reflect the same hesitance toward reopening a criminal proceeding based on *737 anything less than reliable and compelling evidence calling into question, as a factual matter, the convicted person's guilt.
Third, the principles governing claims of actual innocence in federal court, to the extent those principles foreshadow the parameters of a federal constitutional claim of actual innocence, likewise indicate that a federal claim would be governed by similar exacting standards. In Schlup , the Supreme Court explored the countervailing principles at play in the context of post-conviction claims of innocence, balancing societal interests that included finality and conservation of scarce judicial resources against the compelling individual interest in justice that arises when constitutional error has resulted in the conviction of someone who is actually innocent of the crime. 513 U.S. at 324, 115 S.Ct. 851. After balancing those competing interests-to ensure that a petitioner's case is truly extraordinary while still providing a meaningful avenue to avoid manifest injustice-the Court concluded that "a petitioner must show that it is more likely than not that no reasonable juror could have found petitioner guilty beyond a reasonable doubt." Id. at 327, 115 S.Ct. 851. Said another way, "a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting *1120 reasonably, would have voted to find him guilty beyond a reasonable doubt." Id. at 329, 115 S.Ct. 851. Additionally, in Herrera , 506 U.S. at 417, 113 S.Ct. 853, the Supreme Court explained that, if the United States Constitution required that a person sentenced to death be able to raise a freestanding claim of actual innocence, the standard would be very high. The Court explained that, "because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high." Id.[13] *738 For those reasons, we conclude that, at this late stage, decades after petitioner's guilty plea, any claim that is rooted in existing state law or federal constitutional principles-as a freestanding claim or as a basis for excusing procedural default-would require a showing that is at least as convincing as the standard described in Schlup . That is, the balance of societal and individual interests that would circumscribe such claims would require petitioner to demonstrate, at the very least, that newly discovered and reliable evidence makes it more likely than not that no reasonable juror could have found petitioner guilty beyond a reasonable doubt, when the new evidence is considered in the context of the record as a whole.
Even viewed in the light most favorable to petitioner, the allegations and evidence supporting his claim do not satisfy that threshold. See Hernandez-Zurita v. State of Oregon , 290 Or. App. 621, 417 P.3d 548 (2018) (viewing the petition and attachments as a whole, in the light most favorable to the petitioner, to determine whether the petitioner had pleaded a timely claim for relief under the PCHA). Viewed as a whole, the record includes the following incriminating evidence: (1) petitioner's own admissions that he struck Johnson in the head with a metal pipe; (2) Seitz's testimony at sentencing that the group, which had a gang-like structure and chain of command, had formed and executed a plan where petitioner followed Johnson around a tree and hit him with a pipe, the others grabbed Johnson's hands and feet and tied him up, and Chandler pulled out a knife and threatened him; that petitioner probably carried the body to the river (or was at least present at the time), and that he returned covered with blood; and that petitioner received some of Johnson's property when it was divided up after the *739 murder; and (3) testimony that petitioner had admitted to a fellow inmate that he "was going to do" Johnson because he had been bullying him and that "other fellows all jumped in" and "made sure that the job was done."
On the other hand, petitioner's "newly discovered evidence" of his innocence consists solely of testimony from a codefendant, Soller, who is serving a life sentence for the same murder and who claims that petitioner's involvement was limited to hitting Johnson in the head once with a metal pipe. At most, Soller's affidavit creates a conflict in the accomplice testimony; it is far from the type of reliable evidence from which a court could say that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt" in light of other evidence of petitioner's role in Johnson's murder.[14]
*1121 Thus, because petitioner's allegations and new evidence would be legally insufficient to establish "actual innocence" in any freestanding or gateway claim cognizable under Oregon law, absent further legislative action, the trial court properly dismissed the petition, and we affirm that judgment of dismissal.
Affirmed.

Seitz testified that petitioner carried Johnson's feet but, on cross-examination, admitted that he had told police that it was "probably Soller, Chandler, Reeves, and Robinson" who carried Johnson because "I did not know actually who was the ones that carried him down."

The court imposed 360 months' imprisonment for felony murder, 36 months' imprisonment for first-degree robbery, 120 months' imprisonment for first-degree kidnapping, and 18 months' imprisonment for second-degree assault.

Alternatively, petitioner argues that, if the PCHA does not encompass a freestanding actual-innocence claim, then the act violates the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.

Oregon Innocence Project frames its discussion of the remedy clause in terms of the analysis set out in Smothers v. Gresham Transfer, Inc. , 332 Or. 83, 23 P.3d 333 (2001). In Horton v. OHSU , 359 Or. 168, 376 P.3d 998 (2016), which was decided after Oregon Innocence Project filed its brief, the Supreme Court overruled Smothers . Regardless of the particular analytical framework that applies, we understand Oregon Innocence Project to argue that the remedy clause protects a criminal defendant's right to relief in the nature of coram nobis . As we discuss later, there is, at the very least, some support for the view that coram nobis was understood to be part of the constitutional guarantee to a "remedy by due course of law." 294 Or. App. at 733-34, 733 n. 11.

The superintendent also asserts petitioner waived any arguments under Article I, section 16, and Article I, section 10, by not including claims rooted in those provisions in his post-conviction petition.

The District of Columbia's statute is an example of the detailed approach taken by some jurisdictions. Among other provisions, the statute requires the motion to "set forth specific, non-conclusory facts" that identify the new evidence, establish how that evidence demonstrates actual innocence despite the conviction at trial or through a plea, and establish why the evidence is not merely impeaching or cumulative, and the statute specifically describes the findings that must be made in order to grant a new trial based on a showing of actual innocence. D.C. Code Ann. § 22-4135.

Petitioner asserts that arguments about the standard for actual innocence are "improper at this stage in the proceeding." We disagree. The standard for demonstrating actual innocence is inextricably linked to whether and how courts recognize such claims. For example, in its motion to dismiss, the superintendent argued, among other contentions, that "if a credibility determination is required, in order to accept the 'actual innocence' evidence as superior to the evidence which was adduced at trial, then it cannot be the basis for reversing a conviction." Petitioner likewise appreciated the role that a standard of proof plays in formulating the basis for any such claim. In response to the superintendent's motion, he argued, "Accordingly, a court must grant a petitioner post-conviction relief under ORS 138.530(1)(a) if he establishes, more likely than not, that he is actually innocent of a conviction in the challenged judgment because that conviction would constitute a substantial denial of petitioner's Due Process right to liberty and freedom from a wrongful conviction and his Eighth Amendment right not to be punished for a crime he did not commit."

The petition is explicit that Soller's affidavit is the basis for petitioner's claim that he is actually innocent of all offenses except for the initial assault, and that it is this alleged "new" evidence that, in petitioner's view, entitles him to further judicial scrutiny of his convictions on the offenses other than assault.

See Brian R. Means, Postconviction Remedies § 3:2 (July 2018 Update) ("The writ of error coram nobis has been described as the wild ass of the law which the courts cannot control. The authorities agree that the writ carries a core of meaning. Except where it has been expressly abolished, it is a common law remedy, available in both civil and criminal cases, for challenging judgments resting upon errors of fact. Yet beyond this the cases are in hopeless conflict." (Internal quotation marks, citations, and footnotes omitted.) ); William G. Wheatley, Coram Nobis in Oregon and the Need for Modern PostConviction-Procedure Legislation , 38 Or. L. Rev. 158, 160 (1958) ("In Oregon there have been very few recorded attempts to obtain relief through use of coram nobis. This paucity of cases has been the result of both (1) the limited number of cases in which coram nobis is the appropriate remedy and (2) the confused state of the law in Oregon with respect to postconviction remedies.").

As the court explained in Huffman , the remedy of coram nobis shrunk over time as habeas corpus relief and statutory remedies expanded. Id. at 393, 297 P.2d 831 ("In New York and in many other states the motion in the nature of coram nobis was recognized as a common-law remedy but, as other statutory remedies were made available, the scope of coram nobis became correspondingly more limited. So too the modern judicial expansion of the writ of habeas corpus under the influence and pressure of the United States Supreme Court has further narrowed the area within which the remedy of coram nobis is employed or required. * * * The rule is now generally recognized that coram nobis is not available when there is any other remedy.").

Killigrew is not the only court to have linked coram nobis to its state's remedy clause. See, e.g. , State v. Calhoun , 50 Kan. 523, 32 P. 38, 39-40 (1893) (holding that the remedy in the nature of coram nobis "existed at common law there can be no doubt, and we think it still exists wherever it is necessary to invoke its aid"; if the defendant "has no remedy then what becomes of the guaranties of our own state constitution," including its guarantee "that [a]ll persons, for injuries suffered in person, reputation, or property, shall have remedy by due course of law, and justice administered without delay"). In this case, given our resolution, we need not decide the extent of the protections in Article I, section 10, or the constitutionality of any limitations imposed by the PCHA.

Accord. Ex parte Fewell , 261 Ala. 246, 250, 73 So.2d 558, 560 (1954) ("In the exercise of its discretion in matters of the character of this petition, this court looks to the reasonableness of the allegations of the petition and to the existence of the probability of the truth thereof. Moreover, the mere existence of a confession of guilt by one other than the applicant for the writ of error coram nobis will not furnish a sufficient reason for its issuance." (Citations omitted.) ); Johnston v. People , 383 Ill. 91, 94, 48 N.E.2d 350, 351 (1943) ("In order for the writ of error coram nobis to be effective the proof must be such that the judgment would not have been entered had such new facts been known at the time of the trial. This cannot be said to be true, because the balance of the stolen property is not shown to have been in the possession of someone other than petitioner, and hence it is not necessarily true the judgment would not have been the same, even if the facts set forth in the petition were established as true."); State v. Superior Court of Pierce Cty. , 15 Wash. 339, 340-41, 46 P. 399, 400 (1896) (stating that the court was unable to find another case in which coram nobis had been extended to the circumstances of a recanting witness; "[t]o receive her subsequent statement for the purpose of discrediting or impeaching the proceedings or judgment would be to open wide the door to fraud, and lead to most baneful results. The law, upon considerations of public policy, will not receive the affidavit of a juror to impeach his verdict, and renders inadmissible the testimony of third persons as to what they heard jurors say in derogation of their verdict. Like considerations constrain us to hold that the remedy cannot be invoked upon a mere showing that the prosecuting witness has subsequently made contradictory statements, or that she is now willing to swear that her former testimony upon the trial was false.").

Other courts have followed that lead and required more demanding proof in the context of freestanding claims of actual innocence-that the petitioner show by clear and convincing evidence that no reasonable juror could have found petitioner guilty beyond a reasonable doubt. See, e.g. , State ex rel. Amrine v. Roper , 102 S.W.3d 541, 548 (Mo. 2003) (explaining that a "freestanding claim of actual innocence is evaluated on the assumption that the trial was constitutionally adequate" such that "the evidence of actual innocence must be strong enough to undermine the basis for the conviction so as to make the petitioner's continued incarceration and eventual execution manifestly unjust even though the conviction was otherwise the product of a fair trial"; "[a]t the same time, because an actual innocence claim necessarily implies a breakdown in the adversarial process, * * * [t]he appropriate burden of proof for a habeas claim based upon a freestanding claim of actual innocence should strike a balance between these competing standards and require the petitioner to make a clear and convincing showing of actual innocence that undermines confidence in the correctness of the judgment").

At oral argument, petitioner acknowledged that his petition does not directly explain why Soller's testimony could not have been obtained sooner. Because of our disposition, we need not address the parties' dispute over whether that pleading issue is properly before us, or how it relates to the timeliness of petitioner's claims.