***This is a nonprecedential memorandum opinion
pursuant to ORAP 10.30 and may not be cited
except as provided in ORAP 10.30(1).***

Argued and submitted April 13, 2022, reversed and remanded as to petitioner's
actual innocence claim, otherwise affirmed May 17, 2023

JESSE CALEB COMPTON,
*Petitioner-Appellant,*

*v.*

Jeff PREMO,
Superintendent,
Oregon State Penitentiary,
*Defendant-Respondent.*

Marion County Circuit Court
03C10543; A153283

Walter I. Edmonds, Jr., Senior Judge.

Kathleen M. Correll and Bert Dupre argued the cause and filed the briefs for appellant.

Patrick M. Ebbett, Assistant Attorney General, and Adam Holbrook, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, and Egan, Judge, and Kamins, Judge.

KAMINS, J.

Reversed and remanded as to petitioner's actual innocence claim; otherwise affirmed.

**KAMINS, J.**

Petitioner was sentenced to death for the aggravated murder, murder by abuse, first-degree sexual penetration, and first-degree abuse of a corpse of his girlfriend's three-year-old daughter. On automatic and direct review, the Supreme Court affirmed his conviction and death sentence. *State v. Compton*, 333 Or 274, 39 P3d 833, *cert den*, 537 US 841 (2002). In this post-conviction proceeding, petitioner appeals a judgment denying his petition for post-conviction relief (PCR), raising 24 assignments of error, and the superintendent raises one cross-assignment of error. For the reasons explained below, we reverse and remand as to petitioner's actual innocence claim, and otherwise affirm.

We begin by briefly describing the history of this case. The body of a three-year-old child was found in a shallow grave several months after she and her mother, Stella Kiser, had moved into petitioner's apartment. An autopsy uncovered extensive injuries to the child's body, including a large burn on her back and buttocks, penetrative trauma to her vagina and anus, internal abdominal bleeding, ligature marks on her wrists and ankles, and fractured vertebrae, among others. The medical examiner concluded that the victim died of shock from a combination of her injuries. Police arrested petitioner and Kiser, and petitioner admitted that he had found the victim dead in the bedroom, attempted to revive her, and, when his efforts proved unsuccessful, he and Kiser buried the body. Petitioner also confessed to having caused many of the victim's injuries, although not the burn or the penetrative trauma.

In addition to sexual penetration and abuse of a corpse, petitioner was charged with aggravated murder by abuse. ORS 163.115(1)(c) (1997)[1] ("[C]riminal homicide constitutes murder * * * [b]y abuse when a person, recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of a child under

---

[1] *Amended by* Or Laws 1997, ch 850, § 2; Or Laws 1999, ch 782, § 4; Or Laws 2007, ch 717, § 2; Or Laws 2009, ch 660, § 7; Or Laws 2009, ch 785, § 1; Or Laws 2011, ch 291, § 1; Or Laws 2015, ch 820, § 46; Or Laws 2019, ch 634, § 28; Or Laws 2019, ch 635, § 4.

14 years of age[.]"); ORS 163.095(1)(e) (1997)[2] (murder is aggravated if "[t]he homicide occurred in the course of or as a result of intentional maiming or torture of the victim"). At trial, the state's torture theory was that, in addition to causing all the other injuries discovered on the victim, petitioner burned her back and buttocks with a propane torch that he typically used to smoke methamphetamine. The jury convicted petitioner on all counts, and after the jury made the requisite findings during the penalty phase of the proceeding, the court sentenced him to death.

After his conviction and sentence were affirmed on direct appeal, petitioner initiated post-conviction proceedings. Petitioner raised numerous claims relating to both the guilt and penalty phase of his trial, all of which the post-conviction court denied. As we will explain, our analysis of the penalty-phase issues has become more complicated because, while this appeal was pending, the Governor unconditionally commuted the sentences of all those sentenced to death, including petitioner, to life imprisonment without the possibility of parole ("true life").

We review PCR proceedings for errors of law. *Green v. Franke*, 357 Or 301, 312, 350 P3d 188 (2015). Findings of historical fact are binding on this court if there is evidence in the record to support them. *Id*. If the PCR court failed to make findings of fact on all of the issues—and there is evidence from which such facts could be decided more than one way—we will presume the facts were decided consistently with the PCR court's conclusions of law. *Id*.

Most of petitioner's claims argue that his trial counsel was inadequate under Article I, section 11, of the Oregon Constitution, and ineffective under the Sixth and Fourteenth Amendments to the United States Constitution. "To be entitled to post-conviction relief based on inadequate assistance of counsel, a petitioner must show that counsel failed to exercise reasonable professional skill and judgment" and "that counsel's failure had a tendency to affect the result of his trial." *Johnson v. Premo*, 361 Or 688, 699, 399 P3d 431 (2017) (*Johnson I*) (quotation marks and citations

---

[2] *Amended by* Or Laws 1997, ch 850, § 1; Or Laws 2005, ch 264, § 17; Or Laws 2012, ch 54, § 26; Or Laws 2015, ch 614, § 149; Or Laws 2019, ch 635, § 1.

omitted). "[T]he tendency to affect the outcome standard demands more than mere possibility, but less than probability." *Green*, 357 Or at 322. In applying those standards, we "must make every effort to evaluate a lawyer's conduct from the lawyer's perspective at the time, without the distorting effects of hindsight." *Lichau v. Baldwin*, 333 Or 350, 360, 39 P3d 851 (2002). "[T]he standards for determining the adequacy of legal counsel under the state constitution are functionally equivalent to those for determining the effectiveness of counsel under the federal constitution." *Montez v. Czerniak*, 355 Or 1, 6-7, 322 P3d 487, *adh'd to on recons*, 355 Or 598, 330 P3d 595 (2014).

## I.   GUILT PHASE ISSUES

Petitioner's first assignment of error, which asserts that the post-conviction court "applied the wrong legal standard" in assessing trial counsel's effectiveness, does not provide a basis for reversal because it fails to identify a particular "ruling." ORAP 5.45(3) ("Each assignment of error must identify precisely the legal, procedural, factual, or other ruling that is being challenged."); *John Hyland Const., Inc. v. Williamsen & Bleid, Inc.*, 287 Or App 466, 471, 402 P3d 719 (2017) ("That requirement—that the appellant precisely identify the ruling that is being challenged—is not a mere matter of form, or simply a hoop to be jumped through on the way to briefing the merits of an appeal."). As such, we do not independently analyze that assignment, although we do consider the arguments made therein in the context of the remaining assignments, as relevant.

*Forensic claims of error.* Petitioner's second, third, and fourth assignments of error relate to various aspects of trial counsel's preparation of the forensic defense. At trial, the state's forensic evidence consisted of the testimony and autopsy report of Dr. Clifford Nelson, the State Medical Examiner, as well as that of Dr. Jan Bays, a pediatrician who specialized in child abuse and also attended the autopsy. For his part, defense counsel retained former State Medical Examiner Dr. William Brady.

With respect to the large burn on the victim's back and buttocks, the focus of petitioner's second assignment of

error, Dr. Nelson and Dr. Bays both testified that its unusual shape could have been caused by a torch and was not consistent with a hot liquid. Dr. Brady disagreed and testified that had the burn been caused by a torch, he would have expected at least some of the skin to be charred and blackened, which it was not, and that in his view, it was more likely caused by some sort of hot liquid. On appeal of the denial of PCR, petitioner argues that trial counsel acted unreasonably in failing to present additional evidence refuting the state's torch theory and supporting the alternative theory of accidental burning by hot bath water. In particular, petitioner contends that trial counsel should have retained a forensic expert to test the torch, retained a pediatric pathologist instead of a general one, presented data that police collected showing that the water in petitioner's apartment was hot enough to burn a child's skin, presented studies showing that accidental hot water burns are relatively common in children, and more effectively cross-examined the state's experts.

We conclude that the PCR court correctly determined that trial counsel's performance was not deficient because he did present the theory petitioner advances at this PCR proceeding, and that petitioner has not proven prejudice because the new evidence adduced supporting that theory would not have affected the outcome, particularly in light of the evidence of numerous other injuries indicative of torture to the child. As the PCR court found, Dr. Brady was highly qualified and credible, and counsel's decision to rely on his expertise was reasonable. Retaining a pediatric pathologist instead and conducting additional cross-examination of the state's experts would not have had more than a mere possibility of affecting the result of the trial.

In the circumstances of this case, counsel's failure to hire an expert to test the torch also was not unreasonable, nor did the tests conducted by the expert hired for PCR—which confirmed Dr. Brady's opinion—demonstrate a reasonable probability of a different result. Dr. Brady did not believe that he needed additional data in order to opine about the cause of the burn, and his testimony credibly refuted the state's torch theory and supported the hot water theory. *Cf. Johnson I*, 361 Or at 710-11 (trial counsel's failure

to retain a toxicologist was deficient and prejudicial where the toxicologist would have contradicted the defense pathologist's opinion that the victim died from drowning and supported the petitioner's version of events that she died from accidental overdose).

Similarly, counsel was not deficient for failing to present data about the temperature of the apartment's hot water and a study about accidental childhood burns because, as the PCR court found, petitioner did not disclose to him that the victim had been burned with bath water. Nor would that evidence have affected the outcome because the state did not contest that such a burn theoretically could occur; instead, its arguments were premised on its experts' views that the particular shape of the victim's burn was inconsistent with a hot liquid. In sum, attempting to view the issue "without the distorting effects of hindsight," and in light of the many other injuries to the child, we are not persuaded that the approach petitioner identifies could have had a tendency to affect the jury's verdict finding him guilty. *Lichau*, 333 Or at 360.

Petitioner's third assignment of error contends that trial counsel inadequately refuted the sexual penetration charges. At trial, Dr. Nelson and Dr. Bays testified that they observed hemorrhaging in the victim's vagina and anus consistent with penetrating trauma. Dr. Brady, on the other hand, testified on cross-examination that the hemorrhaging could have been from more superficial injuries that worsened due to poor hygiene, lack of circulation, and post-mortem decomposition. Having reviewed the record, we agree with the PCR court that petitioner has not proven that there is more than a mere possibility that the expert medical testimony offered by petitioner during the PCR proceeding, which was largely consistent with Dr. Brady's testimony at trial, would have affected the jury's verdict.

In his fourth assignment of error, petitioner argues that trial counsel was ineffective in failing to forensically refute some of the other injuries which supported the murder by abuse charge. In response, the superintendent points out that petitioner admitted in a videotaped confession to having caused many of those injuries and argues that trial

counsel made a reasonable strategic decision to focus his defense on the most serious allegations and to forego discussion of the less severe injuries so as not to jeopardize his credibility with the jury. The post-conviction court found counsel's choice to be a reasonable tactical decision. We agree.

*Non-forensic claims of error.* Petitioner's fifth and eighth assignments of error relate to alleged *Brady* violations by the state. *Brady v. Maryland*, 373 US 83, 87, 83 S Ct 1194, 10 L Ed 2d 215 (1963) (prosecutor withholding evidence favorable to defense violates due process). We reject the fifth assignment related to the transcript of a jail call and Kiser's counseling records, because even assuming that the state withheld the evidence, petitioner has failed to prove prejudice. *See Strickler v. Greene*, 527 US 263, 281-82, 119 S Ct 1936, 144 L Ed 2d 286 (1999) (reciting components of a *Brady* violation, the third component being prejudice); *Tiner v. Premo*, 284 Or App 59, 73, 391 P3d 816, *rev den*, 361 Or 886 (2017) (where any nondisclosure of disputed evidence did not cause the petitioner to suffer prejudice, then the evidence was not material under *Brady*).

We do not address petitioner's eighth assignment of error because no legal argument as to any alleged *Brady* violation is developed in petitioner's brief. *See Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function to speculate as to what a party's argument might be. Nor is it our proper function to make or develop a party's argument when that party has not endeavored to do so itself.").

Petitioner's sixth, seventh, ninth, tenth, and eleventh assignments of error challenge trial counsel's performance with regard to the nonforensic aspects of the trial. We reject petitioner's sixth and seventh assignments of error, relating to evidence that petitioner argues could have been used to shift blame onto Kiser, because even assuming that trial counsel was deficient, the post-conviction court correctly determined that petitioner did not establish prejudice. Petitioner's argument in the ninth assignment of error about evidence that he contends undercut the state's theory

that the victim was tortured, starved, and isolated before she died similarly fails on prejudice, because the evidence was cumulative of that presented at trial.

Petitioner's tenth assignment of error also provides no basis for reversal, where he contends that trial counsel should have moved to exclude Kiser's recorded statements to police. The majority of Kiser's recorded statements were admissible either as adoptive admissions under OEC 801 (4)(b)(B), or otherwise admissible as "nonhearsay context for defendant's admissible statements." *State v. Davis*, 291 Or App 146, 159, 419 P3d 730, *rev den*, 363 Or 481 (2018). The portions that would not have come in under those rules do not raise more than a mere possibility that the outcome at trial would have been different, and therefore the post-conviction court correctly determined that petitioner did not demonstrate prejudice.

In his eleventh assignment of error, petitioner argues that trial counsel should have better prepared and encouraged him to testify. The post-conviction court found that petitioner was not credible in his assertions that he would have testified, found that he repeatedly told counsel that he would not be able to testify, and found that counsel never prevented petitioner from testifying. Those factual findings are supported by evidence in the record and fore-close this assignment of error. *Green*, 357 Or at 312.

Petitioner's twelfth through fourteenth assignments of error relate to alleged misconduct by police and prosecutors. We do not address the twelfth assignment, which asserts a due process violation, because petitioner did not make such a claim in the operative petition. *See Bowen v. Johnson*, 166 Or App 89, 92, 999 P2d 1159, *rev den*, 330 Or 553 (2000) ("[T]he allegations in the petition frame—indeed, limit—the issues for determination by the post-conviction court."). As to the thirteenth assignment, which argues that trial counsel was ineffective for failing to litigate against alleged witness contamination, we conclude that petitioner did not preserve that argument below and does not seek plain error review, and therefore we do not address it. *See Hale v. Belleque*, 255 Or App 653, 660, 298 P3d 596, *adh'd to on recons*, 258 Or App 587, 312 P3d 533, *rev den*, 354 Or

597 (2013) ("Preservation principles apply in the context of post-conviction relief and, as a general rule, arguments not made to the post-conviction court in support of a claim will not be considered on appeal."). We also reject the fourteenth assignment of error, which argues that trial counsel was ineffective for failing to object to certain arguments by the prosecutor, because the post-conviction court correctly determined that there was no reasonable probability of a different result had trial counsel done so.

Petitioner's twenty-second assignment of error asserts that trial counsel was deficient for failing to file a demurrer to the aggravated murder by abuse charge, which we reject because a demurrer would have been unsuccessful as a matter of law. *See State v. Ventris*, 337 Or 283, 293, 96 P3d 815 (2004) (reasoning that "any of the forms of murder under ORS 163.115—intentional murder, felony murder, or murder by abuse—can become aggravated murder when the circumstances of the murder include one or more of the specified additional elements set out in ORS 163.095"); *State v. Zelinka*, 130 Or App 464, 469-71, 882 P2d 624 (1994), *rev den*, 320 Or 508 (1995) (aggravated murder by abuse indictment did not need to specify the particular incidents of assault or torture to be sufficient).

In the twenty-third assignment of error, petitioner argues that trial counsel was ineffective for failing to request a jury concurrence instruction as to the aggravated murder by abuse charge. That assignment fails, however, because it is unpreserved and petitioner does not seek plain error review.

Petitioner's twenty-fourth assignment of error contends that the post-conviction court erred in granting the superintendent's motion for summary judgment as to his actual innocence claim. We conclude that the post-conviction court erred, because it impermissibly granted summary judgment on the actual innocence claim based on a ground not raised in the parties' summary judgment motions. *See Eklof v. Steward*, 360 Or 717, 734, 385 P3d 1074 (2016) (trial court erred in granting summary judgment when state's motion did not put the pertinent factual matters at issue); *Two Two v. Fujitec America, Inc.*, 355 Or 319, 326, 325 P3d

707 (2014) (parties seeking summary judgment must raise by motion the issues on which they contend they are entitled to prevail as a matter of law and parties opposing summary judgment have the burden of producing evidence that creates a material issue of fact *only* as to those issues). Because the superintendent's only argument for summary judgment was that actual innocence claims are not cognizable under the Post-Conviction Hearing Act, the post-conviction court erred in granting summary judgment on an alternative basis—that petitioner had failed to allege facts that were sufficient to establish a claim for actual innocence.[3]

## II.   PENALTY PHASE ISSUES

Assignments of error 15 through 21, as well as the cross-assignment of error, relate to the penalty phase of petitioner's trial. Petitioner argues that trial counsel's performance in that phase was deficient, and that had counsel performed adequately, the jury might not have made findings necessary to support a sentence of death. Our analysis has become more complicated, however, because of a few recent developments. First, after briefing was completed but before we heard oral arguments, the Supreme Court held that death sentences violate Article I, section 16, of the Oregon Constitution where, after Senate Bill 1013 (2019) was enacted, the person's conduct would no longer constitute aggravated murder. *State v. Bartol*, 368 Or 598, 600, 496 P3d 1013 (2021). At oral argument, the parties informed the court that petitioner had initiated a separate proceeding challenging his death sentence based on *Bartol*, and the superintendent represented that the state would concede that the death penalty was no longer available in petitioner's case. Then, in December 2022, Governor Kate Brown

---

[3] We observe that the post-conviction court's ruling was substantively correct given the standard for actual innocence claims. *See Reeves v. Nooth*, 294 Or App 711, 738, 432 P3d 1105 (2018), *rev den*, 364 Or 680 (2019) (a cognizable free-standing post-conviction claim of actual innocence would require petitioner to demonstrate "at the very least, that newly discovered and reliable evidence makes it more likely than not that no reasonable juror could have found petitioner guilty beyond a reasonable doubt"). The court gave petitioner leave to amend his petition if he discovered facts that would meet the prerequisites for an actual innocence claim, and petitioner never sought to amend his petition. However, given the narrow argument presented in the superintendent's motion for summary judgment, we still must reverse because the court's ruling went beyond the issues at play in the motions.

unconditionally commuted all death sentences, such that petitioner is now sentenced to true life. Or Const, Art V, § 14.

A conviction for aggravated murder carries three possible sentences: death, true life, and life imprisonment with the possibility of parole. ORS 163.105(1) (1997).[4] During the penalty phase of petitioner's trial, petitioner's counsel asked the jury to "choose between" true life and death and told them that "[w]e don't want you to consider the life with possibility of parole." Petitioner does not argue that that strategy was unreasonable under the circumstances. What petitioner does argue is that trial counsel's performance was deficient in various ways regarding how he attempted to persuade the jury that true life was appropriate, and that had counsel performed effectively, petitioner might have been sentenced to true life instead of death.

Because, after the commutation, that is exactly the sentence that petitioner now has, there is an argument to be made that his penalty-phase assignments of error are moot. *Johnson v. Premo*, 302 Or App 578, 587-88, 461 P3d 985 (*Johnson II*), *rev den*, 366 Or 569 (2020) (noting that issues become moot "when a court's decision no longer will have a practical effect on or concerning the rights of the parties" (citation and internal quotation marks omitted)). Neither party makes that argument, however. We also recognize that petitioner made his arguments in the context of challenging a death sentence, and that if they were successful, petitioner could be entitled to resentencing, which could, in theory, ultimately result in the lesser sentence of life with the possibility of parole.

We are therefore left in the difficult position of assessing trial counsel's performance in obtaining a sentence that no longer exists, where petitioner's current sentence is the one that he asserts constitutionally adequate trial counsel should have obtained. In undertaking that analysis, we assume without deciding that petitioner's penalty-phase assignments of error are not moot, and that trial counsel's

---

[4] *Amended by* Or Laws 1999, ch 59, § 31; Or Laws 1999, ch 782, § 5; Or Laws 2007, ch 717, § 1; Or Laws 2009, ch 660, § 6; Or Laws 2015, ch 820, § 45; Or Laws 2019, ch 634, § 27.

performance was deficient in the ways that petitioner identifies and that hypothetically could have related to a possible sentence of life with the possibility of parole.[5] We ultimately conclude that petitioner has not proven prejudice because there is not more than a mere possibility that the jury would have sentenced him to life with the possibility of parole, even if trial counsel had argued for it and presented the evidence which petitioner did on post-conviction.

To explain, we begin by briefly describing the penalty phase of petitioner's trial. To determine which sentence would be imposed, the jury was asked to answer a series of questions. ORS 163.150 (1997).[6] All of the jurors had to answer each of the first three questions in the affirmative for petitioner to receive the death penalty:

(1)   "Was the defendant's intentional maiming and torture that caused the death of [the victim] committed deliberately and with the reasonable expectation that the death of [the victim] would result?" (deliberateness)

(2)   "Is there a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society?" (future dangerousness)

(3)   "Shall a death sentence be imposed? *** The purpose of this question is to allow each of you to take into account any mitigating circumstances that weigh against a sentence of death." (mitigation)

Had any of the jurors answered any of those questions in the negative, they would then have considered another question to determine whether petitioner would receive true life or life with the possibility of parole: "Are there sufficient mitigating circumstances to warrant a sentence of life imprisonment with the possibility of parole or release?"

---

[5] As noted, petitioner does not make that argument on appeal.

[6] *Amended by* Or Laws 1997, ch 784, § 1; Or Laws 1999, ch 1055, § 1; Or Laws 2001, ch 306, § 1; Or Laws 2005, ch 480, § 1; Or Laws 2017, ch 359, § 4; Or Laws 2019, ch 635, § 5.

Turning to the claims for relief, petitioner argues that trial counsel was ineffective in: failing to present additional forensic evidence and evidence shifting the blame to Kiser (A/E 18), failing to rebut a witness's accusations that petitioner sexually abused her children (A/Es 15-17), defending against the third penalty question regarding future dangerousness (A/E 21), failing to obtain and present mitigating testimony from petitioner's family, teachers, friends, and other acquaintances (A/E 19), and failing to obtain and present a mental health evaluation of petitioner (A/E 20).

For these assignments of error, we assume without deciding that counsel was deficient, and further assume that had counsel performed otherwise, one or more members of the jury would have answered "no" to one or more of the death-penalty questions. We therefore consider petitioner's arguments in the context of deciding whether he has proven more than a mere possibility that, had counsel presented the additional evidence petitioner now identifies, the jury would have answered "yes" to the final question, which would have determined whether petitioner would be sentenced to true life or life with the possibility of parole.

In answering that question, we follow the methodology established in *Maxfield v. Cain*, 322 Or App 405, 410-11, 520 P3d 890 (2022). "The first step is to determine the precise question before the sentencing court and the legal standard applicable to that question." *Id.* at 410. As noted, the question before the jury was "are there sufficient mitigating circumstances to warrant a sentence of life imprisonment with the possibility of parole or release?" *See also State v. Ramsey*, 215 Or App 434, 445, 173 P3d 142 (2007), *rev den*, 344 Or 194 (2008) (characterizing the question as "whether a person who already has committed an aggravated murder should serve his life sentence for that crime within the confines of an institution where he will be under strict supervision and will have no lawful access to weapons, or whether he should be permitted the possibility of spending at least part of his life sentence among society at large, under a great deal less supervision"). Ten or more jurors must answer that question in the affirmative to impose a sentence of life with

the possibility of parole. ORS 163.150(2)(a) (1997); *see also Ramsey*, 215 Or App at 440 ("[T]rue life is, in essence, the default sentence for aggravated murder." (Quotation marks and citation omitted.)).

We next "look at the totality of the mitigation evidence and reweigh it against the evidence of aggravation" in order to determine whether there was "more than a mere possibility that competent defense counsel could have used the information" in ways that could have persuaded 10 or more jurors to vote for life with the possibility of parole. *Maxfield*, 322 Or App at 411. To that end, we turn to a brief description of the mitigating and aggravating evidence.

In assignment of error 18, petitioner points to the forensic evidence discussed in assignment of error 2 and the evidence discussed in assignments of error 5 and 6 that Kiser may have caused the victim's injuries instead of petitioner. We consider that evidence for its limited mitigating value, consistent with our discussion above.

Regarding assignments of error 15-17, petitioner presented evidence rebutting a witness's testimony that petitioner sexually abused her children. We assume without deciding that had counsel presented that evidence at trial, the jury would have disbelieved the witness's testimony.

In assignment of error 21, petitioner argues that trial counsel unreasonably failed to present mitigating evidence regarding petitioner's post-arrest actions, namely, that he attempted to escape from jail and expressed to friends and family that if he received a life sentence, he would stab anyone with whom he had a problem and would "escape or die trying." At PCR, petitioner presented evidence, as context for those actions, that he was being targeted and threatened by other inmates. Petitioner also presented evidence that after the escape attempt, when he was transferred to prison, he was classified as medium risk, not high. Petitioner finally presented testimony from an expert, Dr. Reidy, that, based on statistical evidence, petitioner was not at a particularly high risk to commit violent acts in prison.

In terms of aggravating evidence, the state responds that petitioner's escape attempt was violent, in that he

attempted to convince another inmate to incapacitate a guard by beating them up. At the trial, the jury also heard evidence that shortly before he was arrested, petitioner told his sister that he had a fantasy about brutally murdering someone before he died.

In assignments of error 19 and 20, petitioner points to evidence of his "young age [20], behavioral difficulties, disturbed family background, subsequent homelessness, and exposure to deviant adults." At the PCR trial, petitioner presented evidence that he was named after his father's best friend, who then had an affair with petitioner's mother, which led to the acrimonious divorce of his parents. Petitioner's mother married his namesake, and conflicts between his parents continued over custody issues, until petitioner's father eventually relinquished his parental rights. There was also some evidence to suggest that petitioner's stepfather abused petitioner physically and emotionally. In middle school, petitioner was diagnosed with ADHD. He also was placed in special education for severe emotional disturbance.

When petitioner was about 13 years old, he began running away from home and/or was kicked out. He spent the rest of his adolescence moving between various households, some of which were arranged by his mother, others of which were strangers who took petitioner in upon learning that he was homeless. Petitioner dropped out of high school before graduating. Eventually petitioner ended up at the Loomis household, where he was exposed to methamphetamine and significant domestic violence. Petitioner began dating one of the Loomis children, and they had a daughter together.

Petitioner also presented a psychiatric evaluation by Dr. Stewart Newman.[7] Dr. Newman testified that petitioner's ADHD made him less able to tolerate the family disruption in his early life and more difficult for him to follow

---

[7] The superintendent's cross-assignment of error contends that the PCR court erred in considering Dr. Newman's testimony because he had not yet completed his medical degree at the time of petitioner's trial, and therefore would not have been available to testify. Our disposition obviates the need to address that issue.

rules and abide by limits. He also explained that adults with untreated ADHD will sometimes self-medicate with methamphetamine. Dr. Newman further diagnosed petitioner with Anxiety Disorder Not Otherwise Specified and Antisocial Personality Disorder (ASPD), stemming from childhood trauma.

Turning to the aggravating evidence, the superintendent argues that much of the new information presented at PCR was as harmful to petitioner as it was helpful. For instance, there was evidence that petitioner's mother and stepfather worked hard to get petitioner treatment for his ADHD and behavioral difficulties, as well as evidence contradicting petitioner's claims that his stepfather abused him. The superintendent also points to evidence of numerous bad acts that petitioner committed throughout his adolescence, including convincing other children to commit petty crimes, trying to shock stray dogs with his friends, and failing to show remorse for his wrongdoings. At the trial, petitioner's ex-girlfriend and her mother testified that he was occasionally violent toward them, and inappropriately disciplined his daughter.

Any discussion of aggravation in this case must also reckon with the facts of the underlying offenses. In convicting petitioner of aggravated murder, the jury found that he had intentionally tortured the barely-three-year-old victim. The jury also convicted him of penetrating the victim's vagina and anus. Petitioner admitted to hitting her with a wooden spoon, a spatula, and a belt. Witnesses testified to having observed him slap her in the face, yell at her, and call her disparaging names. A few months before her death, the victim suffered a cigarette burn behind her knee and compression fractures on four of her vertebrae. Shortly before her death, in addition to the large burn on her back, buttocks, and genital region, she suffered a severe abdominal injury, likely from being hit or stomped on, as well as numerous other cuts and bruises. Petitioner and Kiser did not seek medical treatment for the victim's burn. Instead, they tied the victim's arms and legs together over her head for eight to 10 hours at a time, 10 to 15 times. She was tied up in that manner when she died.

Weighing all the foregoing mitigating evidence against the aggravating evidence, we conclude that petitioner has not shown more than a mere possibility that competent defense counsel could have persuaded 10 or more jurors to vote for life with the possibility of parole rather than true life.

Reversed and remanded as to petitioner's actual innocence claim; otherwise affirmed.